# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**ORCHESTRATE HR, INC. and
VIVATURE, INC.,**

                    **Plaintiffs**,

**v.**

**BLUE CROSS AND BLUE SHIELD OF
KANSAS, INC.,**

                    **Defendant**.

**Case No. 19-4007-DDC**

## MEMORANDUM AND ORDER

Plaintiffs Orchestrate HR, Inc. and Vivature, Inc. provide health insurance billing services for colleges. Highly summarized, plaintiffs help the colleges bill insurance companies for (among other things) athletic training services that the colleges provide their student athletes. In 2017, defendant Blue Cross and Blue Shield of Kansas, Inc. investigated insurance claims submitted by plaintiffs on behalf of colleges. Defendant determined that plaintiffs had billed improperly for a variety of reasons. But later, as things turned out, some of defendant's conclusions ultimately lacked support. Nonetheless, defendant took several actions. They included:

- sending letters to the colleges' doctors terminating their contracting provider agreements,

- filing complaints against the colleges' athletic trainers with the Kansas State Board of Healing Arts,

- alerting other Blue Cross and Blue Shield entities about its investigation,

- filing a complaint about plaintiffs with the Kansas Department of Insurance, and

- reporting plaintiffs to the Federal Bureau of Investigation, Department of Justice, and others.

Thus began a long, bitter conflict culminating in this long and bitter lawsuit. At first, the parties tried to work together to process and pay the disputed claims for benefits. But that effort sputtered to a stop, and the parties blame each other for it. Defendant asserts that plaintiffs never managed to file the claims correctly. Plaintiffs assert that defendant gave them useless instructions about filing the claims and never intended to pay them anyway. Plaintiffs emphasize that, despite months of attempts to reconcile their issues, defendant never told them that it already had determined the claims were fraudulent.

Plaintiffs characterize defendant's actions as a cynical, targeted, and an intentional scheme designed to ruin plaintiffs' relationships with their clients. Plaintiffs seek to hold defendant accountable for its alleged scheme under four legal theories: defamation, fraud, fraud by nondisclosure, and tortious interference. Defendant has filed a Motion for Summary Judgment (Doc. 549), asserting that all four theories fail as a matter of law.

The court concludes that plaintiffs have failed to assert any viable damages theories. This failure entitles defendant to summary judgment. The court explains its decision, below. But, first, the court addresses two of defendant's peripheral requests: a motion about plaintiffs' Rule 30(b)(6) deposition errata sheet (Doc. 559); and an objection to plaintiffs' late addition to the Pretrial Order (Doc. 561).

## I.      Rule 30(b)(6) Deposition Errata Sheet

Before reciting the summary judgment facts, the court addresses defendant's "Motion to Disregard Certain Portions of the Deposition Errata Sheet of Plaintiffs' Federal Rule of Civil Procedure 30(b)(6) Corporate Representative" (Doc. 559). Defendant's motion argues that plaintiffs have changed the deposition testimony of Mouzon Bass III materially—and

improperly—through Mr. Bass's deposition's errata sheet.  Defendant asserts that these changes are material ones because they affect defendant's statute of limitations arguments.

As mentioned above, the court decides this summary judgment motion on the issue of damages alone.  So, the court need not reach defendant's statute of limitations arguments, which are at the heart of dispute about the errata sheet.  Mr. Bass's changes to his deposition in the errata sheet don't matter to the court's decision.  The court thus denies this motion (Doc. 559) as moot.

## II.        Objection to Pretrial Insert

The court held a pretrial conference.  Chaos ensued.  The court now addresses the result of that chaos:  "Defendant's Objection to Plaintiffs' Post Pretrial Conference Insert" (Doc. 561).

At the pretrial conference, plaintiffs expressed their concern about preserving all defamation claims.  Doc. 542 at 25 (Hr'g Tr. 25:2–9).  The court reminded plaintiffs "that this trial is going to be tried on what's in this pretrial order."  *Id.* (Hr'g Tr. 25:18–21).  Plaintiffs emailed the court a 272-page "Insert to Pretrial Order."   The court added the insert to the Pretrial Order and, predictably, defendant objected.  Doc. 561.  Defendant asserts that the court should strike the insert because it's late and, for a variety of other reasons, improper.

The court overrules defendant's objection as moot.  As explained below, the court concludes that plaintiffs' claims fail as a matter of law—even considering plaintiffs' late and potentially improper insert.

With two of defendant's filings resolved, the court now turns to the main event:  the summary judgment motion.  This effort begins with the summary judgment facts.

## III.       Summary Judgment Facts

This analysis begins with threshold matter:  the court must address "Plaintiffs' Objections to Defendant's Motion for Summary [Judgment] Evidence and Exhibits" (Doc. 607-14 at 7–11

(Ex. 26.1)).  This document purports to object to defendant's summary judgment evidence.

Plaintiffs buried these objections:  they're attached to an affidavit that's attached to plaintiffs'

summary judgment response.  This nesting doll methodology—attaching evidentiary

"objections" to an attachment to a brief—doesn't comply with this court's rules about summary

judgment facts.  D. Kan. Rule 56.1(b)(1) requires parties to confine their factual disputes in their

opposition briefs.  By ignoring this rule, plaintiffs have granted themselves additional pages of

briefing.  In fairness, defendant tried a similar tactic.  *See* Doc. 599.  But, in a phone conference,

the court explained to defendant that filing an "objection" not contained in a summary judgment

brief doesn't comply with our local rules and threatened to strike defendant's improper filing on

its own motion.  *See* Doc. 602.  Defendant withdrew the offending objection of its own accord.

Doc. 603.

　　The court thus responds, in kind, on its own motion, striking "Plaintiffs' Objections to

Defendant's Motion for Summary [Judgment] Evidence and Exhibits" (Doc. 607-14 at 7–11 (Ex.

26.1)) because plaintiffs failed to comply with the court's summary judgment rules.  If plaintiffs

wanted to assert these objections, they should've put those arguments in their brief.

　　The court also notes here, and elsewhere throughout this Order, that it disregards the

many improper legal conclusions submitted by the parties as "facts."[1]  And, at the outset of these

---

[1]　　For example, plaintiffs' response brief and Mr. Bass's declaration assert numerous legal
conclusions.  Here's a representative sample:  (1) plaintiffs "justifiably relied" on defendant's
representations, (2) defendant "recklessly broadcast" information to third parties, (3) defendant tortiously
interfered with plaintiffs' contracts in 12 different ways, (4) plaintiffs "suffered damages as a direct result
of these actions by" defendant, (5) defendant "maliciously made numerous false accusations regarding
Vivature," (6) defendant's statements were "defamatory," (7) a "reasonable third party" would "believe"
defendant's communications accused plaintiffs of misconduct," (8) defendant "BCBSKS' unlawful
actions proximately caused damages to Plaintiffs," and (9) "Plaintiffs had a reasonable expectation that
their contracts would not be tortiously interfered with by the '800 lb. gorilla' of the insurance industry."
Doc. 579 at 30–33, 36–37, 38; Doc. 609-1 at 10–11, 14, 17–18, 21, 22 (Bass Decl. ¶¶ 39, 40, 51, 52, 61,
64, 65, 75, 77).  These legal conclusions aren't evidence, so the court doesn't consider them as part of the
summary judgment facts.  *See, e.g.*, *Gerson v. Logan River Acad.*, 20 F.4th 1263, 1281 (10th Cir. 2021)
(rejecting declaration that characterized something as "kidnapping" because the "kidnapping allegation

facts, the court notes that many of these facts don't matter to the court's decision that plaintiffs fail to present a viable damages theory. These facts matter to other elements of plaintiffs' tort claims, but even if plaintiffs have created a triable issue for the other elements, plaintiffs' claims fail without a legally cognizable damage claim. The court provides these facts nonetheless for context and because some matter to the court's threshold determinations about plaintiffs' prudential standing and whether plaintiffs' damages improperly seek to recover insurance policy benefits.

### *Plaintiffs' Business*

Plaintiffs help their clients submit claims to insurance companies. Doc. 609-1 at 3 (Bass Decl. ¶ 4). Plaintiffs have more than ten years of experience and have become well-versed in the claims submission process through their work with hundreds of clients and insurance companies. *Id.* Plaintiffs contract with colleges to help them monetize services performed by their licensed athletic trainers. *Id.* at 2 (Bass Decl. ¶ 2). Plaintiffs provide services, including use of proprietary software and billing. *Id.* Plaintiffs' clients use plaintiff Vivature's[2] electronic medical record software to document the medical services performed by the clients' athletic trainers. *Id.* at 5 (Bass Decl. ¶ 14).

---

[was] a legal conclusion, and assertions of law do not bind the court"); *Skrzypczak v. Roman Cath. Diocese of Tulsa*, 611 F.3d 1238, 1244 (10th Cir. 2010) (rejecting "conclusory" affidavit that "state[d], in the affiant's opinion, the legal conclusion the court should reach"); *Sprint Commc'ns Co. v. Vonage Holdings Corp.*, 500 F. Supp. 2d 1290, 1304 (D. Kan. 2007) (explaining that legal conclusions are not "facts as would be admissible in evidence" as Fed. R. Civ. P. 56 requires (citations and internal quotation marks omitted)); *see also Shelter Mortg. Corp. v. Castle Mortg. Co., L.C.*, 117 F. App'x 6, 10 (10th Cir. 2004) (holding that the district court "correctly struck inadmissible hearsay and inadmissible legal conclusions" on summary judgment).

[2]       Plaintiff Vivature is a wholly owned subsidiary of plaintiff Orchestrate. Doc. 609-1 at 2 (Bass Decl. ¶ 1). The court's statement of the summary judgment facts mostly refers to plaintiff Vivature because Vivature contracted with 11 of plaintiffs' 12 Kansas Clients.

Plaintiffs' "Kansas Clients" included Washburn University, Fort Hays State University, Emporia State University, Allen County Community College, Benedictine College, Pittsburg State University, Tabor College, Kansas Wesleyan University, Southwestern College, McPherson College, Baker University, and Newman University.  *Id.* (Bass Decl. ¶ 2 n.1); *Id.* at 6 (Bass Decl. ¶ 17); *Id.* (Bass Decl. ¶ 19).  Plaintiffs held a contractual power-of-attorney for billing purposes.  *Id.* at 4 (Bass Decl. ¶ 9).  Plaintiffs' contracts allowed plaintiffs to receive a percentage, ranging from 20% to 50% of the billings.  *Id.*  Plaintiffs intended to collect the billed charges for the relevant "CPT" codes.  *Id.* at 5 (Bass Decl. ¶ 15).

### Defendant's Business

Defendant Blue Cross and Blue Shield of Kansas is an independent licensee of the Blue Cross Blue Shield Association.  Doc. 551-4 at 2 (Robertson Decl. ¶ 2).  Defendant has policies and procedures that establish documentation standards, documentation requirements, medical records requirements, signature requirements, and claims filing requirements.  *Id.*

Whether a provider is in-network or out-of-network, the provider must register with defendant's claim system.  Doc. 571-2 at 3 (Zimmerman Decl. ¶ 3).  If a provider fails to supply its information properly in defendant's claim system, then claims submitted by the provider or on its behalf won't make it into defendant's claim system.  *Id.*  And defendant only can process and adjudicate claims that make it into its claim system.  *Id.*

### Defendant's Investigation

In late 2016 or early 2017, defendant conducted post-payment reviews of insurance claims submitted to defendant from the following providers:

- Dr. Peter Loo, for services provided at Washburn University;

- Dr. Stephen Pro, for services provided at Baker University;

- Dr. Andrew Porter, for services provided at Newman University;

- Dr. Marshall Havenhill, for services provided at Emporia State;

- Dr. Gary Harbin, for services provided at Kansas Wesleyan University;

- Dr. Wally Walstorm, for services provided at Fort Hays State; and

- Dr. Bradley Bruner, for services provided at Southwestern College.

Doc. 551-1 at 2–3 (Mzhickteno Decl. ¶ 2); Doc. 571-2 at 3–4 (Zimmerman Decl. ¶ 5).

Defendant's contracts with each doctor—the provider agreements—entitled defendant to conduct

these post-payment reviews.  Doc. 551 at 2–3 (King Decl. ¶ 2); Doc. 571-2 at 3–4 (Zimmerman

Decl. ¶ 5).  Defendant's policies and procedures also allowed for these post-payment reviews.

Doc. 571-2 at 3–4 (Zimmerman Decl. ¶ 5).

After its investigation, defendant determined that plaintiff Vivature, as the third party

billing agent for its Kansas Clients, had:

- improperly billed for strapping when nothing more than a Band-Aid/bandage was applied to the member;

- submitted claims using certain doctors' National Provider Identification (NPI) numbers, under those NPI numbers without the doctors' knowledge, consent, or permission;

- included the "signature" of the doctor on a Medical Attestation Record when the doctor didn't sign the document, didn't give plaintiff Vivature permission to sign the document, and never had seen the document;

- submitted claims with little or no supporting medical records;

- included medical records with claims that didn't support the services billed;

- billed time procedure CPT codes that overbilled the actual time spent performing the services;

- billed for services performed by unlicensed student athletic trainers; and

- submitted insurance claims using a doctor's NPI number and identifying the doctor as the provider when an athletic trainer, not the doctor, had performed the services billed.

Doc. 571-2 at 5–6 (Zimmerman Decl. ¶ 8).[3]  Defendant testified that there's nothing inherently wrong with a provider using a third party billing company.  Doc. 579-4 at 11 (Holmes Dep. 50:3–7).

### Stop Pay F Code

Based on these post-payment reviews, on January 13, 2017, defendant placed a "Stop Pay F" code on the NPI number of any provider providing medical services at the above schools, and some other schools in Kansas.  Doc. 551-1 at 2–3 (Mzhickteno Decl. ¶ 2); Doc. 571-2 at 3–4 (Zimmerman Decl. ¶ 5); Doc. 579-3 at 93 (Zimmerman Dep. 378:8–11).  Defendant made this decision based on the identity of the claims' biller:  plaintiff Vivature.  Doc. 579-3 at 25 (Zimmerman Dep. 76:5–20); Id. at 61–63 (Zimmerman Dep. 285:22–287:10).  Once defendant applied a "Stop Pay F" code to claims filed by plaintiff Vivature, defendant began treating those claims differently.  Id. at 62–63 (Zimmerman Dep. 286:24–287:10).

Most claims—90% to 95%—come to defendant electronically, and defendant auto-adjudicates most of the claims without requesting medical records.  Doc. 579-4 at 39 (Holmes Dep. 171:9–19); Doc. 579-5 at 8 (Robertson Dep. 17:15–22).  But a "Stop Pay F" code kicks claims out of defendant's normal processes because the code indicates "there's a real problem."  Doc. 579-3 at 62 (Zimmerman Dep. 286:19–23).  The "Stop Pay F" Code automatically sends claims to defendant's Special Investigations Unit.  Doc. 551-1 at 3 (Mzhickteno Decl. ¶ 3).  A

---

[3]    Plaintiffs attempt to controvert the conclusions of defendant's investigation because the declarant, Ms. Zimmerman, attached the suspect claims to her declaration, but failed to explain why the suspect claims support the results of the investigation.  Doc. 579 at 11.  As an initial matter, plaintiffs don't cite any authority for their argument that Ms. Zimmerman must support each conclusion individually.  See id. And Ms. Zimmerman is the manager of defendant's Special Investigations Unit.  Doc. 571-2 at 2 (Zimmerman Decl. ¶ 1).  Her declaration also testified that she has personal knowledge of the facts in her affidavit.  Id.  Ms. Zimmerman thus can testify, via declaration, about the results of defendant's investigation.  The court doesn't take these conclusions as truth, but merely recites that defendant reached these conclusions—whether the conclusions are true or not.

member of defendant's SIU then manually reviews each claim and determines whether the claim

was submitted with the necessary information and records.  *Id.*

### Alerting Third Parties

On January 19, 2017, defendant sent an SIU alert to others in the Blue Cross Blue Shield

Association.  Doc. 607-17 at 52–53 (Ex. 26.48).  The alert's summary provides:

> Investigation has just begun.  We are in the process of determining the licensure of
> the actual practitioners and are attempting to obtain medical records.  Kansas has
> specific requirements for allowing an athletic trainer into our network.  They have
> to be licensed and part of a group.  The group has to contain DPT's.  We also
> reimburse at 50% of allowance for eligible services by an AT.  All services billed
> to date have been under the MD/DO provider at full allowance.

*Id.* at 53.  The SIU alert recommended:  "Review eligibility of athletic trainers in your member

contracts and State license requirements.  See their website: [ HYPERLINK

"http://vivature.com"]."  *Id.*  So, the SIU alert targeted plaintiff Vivature specifically.

In addition to its internal alert, defendant contacted law enforcement to investigate

because law enforcement had investigatory resources that defendant lacked.[4]  Doc. 579-6 at 19–

22 (Mzhickteno Dep. 324:17–327:10).  In February 2017, defendant filed a "Suspected Insurance

Fraud" report about plaintiff Vivature with the Kansas Department of Insurance.  Doc. 579-29 at

60 (Ex. 26.51).  Defendant's suspected fraud report provided the following synopsis:

> Vendor selling [electronic medical record] and billing scheme to Universities
> promising their athletic departments a 6 figure income.  Not all physicians tied to

---

[4]     Plaintiffs assert that defendant didn't conduct a proper investigation before it broadcast its
conclusions.  Plaintiffs insinuate that defendant didn't have the resources to conduct a proper
investigation, but the evidence shows that defendant wanted law enforcement to use its considerable
resources to do a *thorough* investigation.  Doc. 579 at 10–11.  Plaintiffs cite the deposition testimony of
Ms. Mzhickteno.  *See id.* (citing Doc. 579-6 at 19–22 (Mzhickteno Dep. 324:17–327:10)).  Counsel asked
Ms. Mzhickteno this question, "We're talking about BCBSKS doesn't have the resources to conduct a
proper investigation and that's you want law enforcement to get involved, correct?"  Doc. 579-6 at 21–22
(Mzhickteno Dep. 326:24–327:2).  Ms. Mzhickteno responded, "A *thorough* investigation."  *Id.* at 22
(Mzhickteno Dep. 327:3) (emphasis added).  Thus, the testimony that plaintiffs cite for their purported
statement of fact—*i.e.*, defendant failed to conduct a proper investigation—doesn't support plaintiffs'
factual proposition.

universities know their NPI is being used to bill for services.  All services being rendered by athletic trainers and most not licensed.  Medical records being submitted by Vivature are cookie cutter and include an attestation page from a physician who is not rendering or supervising the services.

*Id.* at 61 (Ex. 26.51).  Defendant didn't tell plaintiffs that it had filed this suspected fraud report with the KID.  Doc. 609-1 at 16 (Bass Decl. ¶ 59).

### *Fraud?*

Recall that defendant's investigation turned up numerous concerns about fraud. Defendant later walked back some of those concerns.  For example, defendant's investigation found that plaintiff Vivature had submitted claims with little to no supporting documentation. Doc. 571-2 at 3–4 (Zimmerman Decl. ¶ 5).  But defendant admitted that a failure to include all documents isn't necessarily fraud.  Doc. 579-3 at 44 (Zimmerman Dep. 183:4–7).  It's possible that a document simply wasn't provided.[5]  *Id.* at 82 (Zimmerman Dep. 338:10–24).  Yet defendant also testified that billing for claims where the documents don't support the claims is fraud.  *Id.* at 42 (Zimmerman Dep. 181:21–25).

Defendant's investigation turned up issues with doctors' NPI numbers, but eventually plaintiffs stopped using doctors' NPI numbers.  Defendant suspected plaintiffs of fraud because of claims submitted under doctors' NPI numbers when athletic trainers actually performed the services.  Doc. 571-2 at 5–6 (Zimmerman Decl. ¶ 8).  But, on October 5, 2017, defendant's employee, Douglas Scott, wrote to his fellow employees that Ms. Mzhickteno's claims were "all billed using the AT's NPI, no physician claims."  Doc. 579-8 at 66 (Ex. 7.4).

---

[5]     In the court's view, this statement of fact summarizes the following exchange in the light most favorable to plaintiffs: "Q.  Okay.  So is there any indication here that BCBSKS . . . well, first of all, ma'am, that's not fraud, right?  That's, hey, we clearly don't have the piece of paper that would support this claim.  Could literally be it wasn't provided? . . . A.  That's correct."  Doc. 579-3 at 82 (Zimmerman Dep. 338:15–24).  Answers to patently compound questions leave lots of room for doubt.  But as it must, the court construes this exchange in the light most favorable to plaintiffs.

Defendant's investigation concluded that plaintiff Vivature had billed for services performed by unlicensed student athletic trainers.  Doc. 571-2 at 5–6 (Zimmerman Decl. ¶ 8). But no school had any knowledge or evidence that plaintiffs had billed for unlicensed trainers. Doc. 579-9 at 18 (Washburn University Dep. 60:13–24); Doc. 579-11 at 9–10 (Allen County Community College Dep. 90:25–91:3); Doc. 579-13 at 28 (Baker University Dep. 173:15–19); Doc. 579-14 at 11 (Benedictine College Dep. 177:6–8); Doc. 579-15 at 24 (Emporia State Dep. 229:9–12); Doc. 579-16 at 32 (Fort Hays State Dep. 101:4–11); Doc. 579-18 at 22–23 (Kansas Wesleyan University Dep. 112:23–113:7); Doc. 579-20 at 28 (McPherson College Dep. 164:10–19); Doc. 579-22 at 15–16 (Pittsburg State Dep. 92:23–93:2); Doc. 579-24 at 13 (Southwestern College Dep. 163:20–24); Doc. 579-25 at 22 (Tabor College Dep. 161:1–10); Doc. 607-8 at 23 (Newman University Dep. 155:12–16).

Some of defendant's other conclusions lacked support.  Defendant couldn't find evidence to support Ms. Mzhickteno's claim that plaintiff Vivature had billed for a Band-Aid.  Doc. 579-3 at 57–58 (Zimmerman Dep. 280:13–281:3).  And even though defendant had concluded that plaintiff Vivature had used split billing, split billing itself isn't fraudulent.  *Id.* at 38 (Zimmerman Dep. 160:11–25).

### *The February 14, 2017, Letters*

Defendant reached several conclusions about Dr. Loo of Washburn University, Dr. Porter of Newman University, Dr. Pro of Baker University, Dr. Bruner of Southwestern College, Dr. Havehnhill of Emporia State, Dr. Harbin of Kansas Wesleyan University, Dr. Walstrom of Fort Hays State.  Doc. 551 at 3 (King Decl. ¶ 3); *Id.* at 8 (Ex. 1-A); *Id.* at 10 (Ex. 1-B); *Id.* at 12 (Ex. 1-C); *Id.* at 14 (Ex. 1-D); *Id.* at 16 (Ex. 1-E); *Id.* at 18 (Ex. 1-F); *Id* at 20 (Ex. 1-G).  These doctors hadn't set up a clinic at their respective schools.  *Id.* at 3 (King Decl. ¶ 3).  The doctors weren't performing the vast majority of services billed, though the services were billed under the

doctors' NPI numbers. *Id.* And the doctors hadn't satisfied other requirements for contracting providers. *Id.* So, defendant sent these seven doctors letters terminating their contracting provider agreements, effective March 17, 2017. *Id.*; *see also id.* at 8 (Ex. 1-A); *Id.* at 10 (Ex. 1-B); *Id.* at 12 (Ex. 1-C); *Id.* at 14 (Ex. 1-D); *Id.* at 16 (Ex. 1-E); *Id.* at 18 (Ex. 1-F); *Id.* at 20 (Ex. 1-G). Shortly after terminating these contracting provider agreements, defendant sent final post-payment review letters to each doctor and the athletic director for each doctor's school, summarizing the results of defendant's post-payment reviews. *Id.* at 3 (King Decl. ¶ 5); *Id.* at 24–27 (Ex. 1-I); *Id.* at 29–30 (Ex. 1-J); *Id.* at 32–34 (Ex. 1-K); *Id.* at 36–37 (Ex. 1-L); *Id.* at 39–41 (Ex. 1-M); *Id.* at 43–45 (Ex. 1-N); *Id.* at 47–49 (Ex. 1-O). None of these doctors challenged defendant's audit findings and conclusions. Doc. 551 at 3 (King Decl. ¶¶ 3, 5).

When defendant terminated these doctors' provider agreements, plaintiffs handled the doctors' billing.[6] Doc. 609-1 at 22 (Bass Decl. ¶ 77 n.54). Plaintiffs' contracts with the colleges authorized plaintiffs to perform all billing services. *Id.* at 4–5 (Bass Decl. ¶ 12). As the colleges' third party billing agent, plaintiffs were responsible for billing, dealing with adjudication of insurance claims, and appealing determinations of insurance companies. *Id.* So, plaintiffs served as defendant's point of contact for billing-related matters. *Id.* at 22 (Bass Decl. ¶ 77 n.54). Unfortunately, plaintiffs had issues getting defendant to communicate with them, as the court discusses later.

---

[6]  Plaintiffs' statement of facts asserts that defendant "admitted that the termination of Plaintiffs' providers from BCBSKS' network was done by BCBSKS intentionally, knowing that it would produce 'a headache' for the providers." Doc. 579 at 38. But, plaintiffs don't cite any admissible evidence to support this proposition that defendant admitted as much. Instead, they cite Mr. Bass's declaration. *Id.* (citing Doc. 609-1 at 22 (Bass Decl. ¶ 77)). The problem with this approach is that Mr. Bass's declaration doesn't cite any evidence for this proposition, either. Nor does Mr. Bass explain how he has personal knowledge about defendant's intent and knowledge. The court's analysis thus disregards this statement of purported fact by plaintiffs.

These letters had consequences for plaintiffs' relationship with their clients.  Before defendant sent Baker University's doctor the letter on February 14, 2017, Baker University hadn't had any issues with plaintiff Vivature.  Doc. 579-13 at 6–8 (Baker University Dep. 114:3–116:16).  Similarly, Newman University hadn't had any issues with plaintiff Vivature until that point, either.  Doc. 579-21 at 14–16 (Newman University Dep. 122:4–124:6).  But Newman University stopped billing after defendant communicated with its doctor.  *Id.*  Emporia State didn't experience any issues until February 2017.  Doc. 579-15 at 20–21 (Emporia State Dep. 201:25–202:4).  Same for Fort Hays State:  no issues until the "hassle" with defendant.  Doc. 579-16 at 23 (Fort Hays State Dep. 89:9–90:5).  And same for Pittsburg State:  no issues with plaintiff Vivature until defendant stopped paying claims.  Doc. 579-22 at 13 (Pittsburg State Dep. 90:1–20).  Defendant audited Benedictine College in February 2019.  Doc. 579-14 at 8–9 (Benedictine College Dep. 170:13–171:8).  Before this audit, Benedictine College's relationship with plaintiff Vivature was a good one.  *Id.*

### *Others Investigate*

Defendant filed complaints with the Kansas State Board of Healing Arts against many of the Kansas Clients' athletic trainers, and the Board of Healing Arts investigated.  *See* Doc. 579-9 at 11–12 (Washburn University Dep. 53:21–54:11); Doc. 579-12 at 13–15 (Allen County Community College Dep. 41:21–43:23).  Though the Board of Healing Arts investigated the athletic trainers, the investigation concerned plaintiff Vivature.  Doc. 579-9 at 13–14 (Washburn University Dep. 55:5–56:21).  Tabor College testified that defendant, in its view, used its Board of Healing Arts complaints "to impact the relationship between" plaintiff Vivature and its clients.  Doc. 579-25 at 18 (Tabor College Dep. 137:7–12).

Washburn University also investigated plaintiffs.  Before February 2017, defendant contacted Washburn University and inquired about an entity called "Washburn University Sports

Medicine."  Doc. 579-8 at 35–38 (Washburn University Dep. 341:4–344:9).  Based on defendant's inquiry, Washburn University's counsel became concerned that, perhaps, plaintiff Vivature had created the entity.  *Id.*  By May 2018, Washburn University had concerns that its contract with plaintiff Vivature raised fee-splitting issues.  Doc. 551-7 at 117 (Washburn University Dep. 171:4–8); *Id.* at 308–09 (Washburn University Dep. Ex. 29).  And in October 2018, a hospital contacted plaintiff Vivature about Vivature's billing at Washburn University and ordered plaintiffs to cease and desist billing for the hospital's providers.  Doc. 551-7 at 323 (Washburn University Dep. Ex. 34).  Eventually, Washburn University concluded that it disagreed with the hospital's conclusions.  Doc. 579-7 at 7–8 (Washburn University Dep. 47:17–48:2).

Baker University also investigated internally.  In November 2016, Baker University's doctor, Dr. Pro, had signed documents authorizing billing by Baker University, through plaintiff Vivature.  Doc. 579-13 at 22 (Baker University Dep. 154:1–20).  Dr. Pro knew that Baker University intended to identify him as the supervising physician when it billed for services performed by Baker University's athletic trainers.  *Id.* at 29 (Baker University Dep. 214:3–12).  Defendant received Dr. Pro's signed contract with Baker University on February 21, 2017.  *Id.* at 38 (Ex. 12.3).  Upon receipt, defendant's employee wrote to her colleagues, "[W]ell I hate to say this but the signature on this letter matches what we got on the contract from Baker University! It appears Dr. Pro did sign something.  Whether he knew it or not.  Bummer!"  *Id.*

In sum, some of defendant's conclusions about plaintiffs lacked support, but they nonetheless caused quite the headache.

### *Trying to Make It Work*

Throughout 2017, defendant worked with plaintiff Vivature.  Doc. 551 at 3 (King Decl. ¶ 6).  The parties sought to get plaintiffs' Kansas Clients' claims submitted properly to

defendant.  *Id.*  Defendant repeatedly advised plaintiffs that, so long as plaintiff Vivature made the changes defendant had requested, defendant would process and pay the claims.  Doc. 609-1 at 8 (Bass Decl. ¶ 29).  Defendant never told plaintiffs that it planned to deny the claims.  *Id.*  And defendant never claimed plaintiffs had committed insurance fraud or taken improper actions when submitting claims.  *Id.*

Defendant's employee, Cathy Holmes, told plaintiffs that plaintiff Vivature should bill claims using the performing provider's NPI number—and not the supervising provider's NPI number—to comply with defendant's policies and procedures.  Doc. 571-1 at 2–3 (Holmes Decl. ¶ 2 n.1).  Ms. Holmes also explained to plaintiff Vivature the information defendant needed for the athletic trainers so defendant could set up the trainers within defendant's system.  *Id.*

Plaintiffs didn't require defendant's assistance to get claims submitted or paid; plaintiffs "had been doing so successfully for years."  Doc. 609-1 at 9 (Bass Decl. ¶ 34).  Plaintiffs believe that they "bent over backwards to jump through the multiple and ever-changing hoops that BCBSKS put in place."  *Id.* at 9 (Bass Decl. ¶ 34).  But when plaintiff Vivature followed defendant's instructions, defendant's electronic medical record system still rejected the claims. *Id.* at 12 (Bass Decl. ¶ 43).

For example, in July 2017, plaintiff Vivature started submitting claims using the athletic trainers' NPI as defendant had requested.  *Id.* at 137 (Ex. 1.11).  But defendant denied those claims because defendant hadn't yet loaded the trainers' NPI numbers into its system.  *Id.*  On August 1, 2017, defendant told plaintiff Vivature to hold off on filing claims.  *Id.*  On August 3, 2017, defendant told plaintiff Vivature that it had found a glitch on defendant's side of things and plaintiff Vivature could refile the claims.  *Id.* at 139 (Ex. 1.12); Doc. 579-29 at 58 (Ex. 26.50).

Despite these issues, by September 2017, plaintiffs believed that if they followed defendant's instructions and resubmitted the claims, defendant would adjudicate and pay the claims. *Id.* at 10 (Bass Decl. ¶ 38). Defendant never indicated otherwise. *Id.* Plaintiffs assert that, if any of defendant's employees had indicated that defendant wouldn't adjudicate and pay the claims, plaintiffs "would have taken immediate action, including filing suit against" defendant. *Id.* By October 5, 2017, defendant's employee, Douglas Scott, wrote to his fellow employees that Ms. Mzhickteno's claims were "all billed using the AT's NPI, no physician claims." Doc. 579-8 at 66 (Ex. 7.4). Defendant rejected the claims nonetheless.

### *The October 17, 2017, Call*

The parties scheduled a call "to try to put an end to the constant requested changes that were implemented but that BCBSKS's system would later reject[.]" Doc. 609-1 at 12 (Bass Decl. ¶ 43). During the call, Ms. Holmes explained that plaintiff Vivature wasn't filling out and correctly submitting its Kansas Clients' claims. Doc. 551 at 4; Doc. 551-1 at 5–6 (Mzhickteno Decl. ¶ 8); Doc. 571-1 at 2–3 (Holmes Decl. ¶ 2). Ms. Holmes told plaintiff Vivature, as she previously had told it many times before, that defendant's policies and procedures didn't allow plaintiff Vivature to submit claims under a doctor's NPI number when an athletic trainer had performed the billed medical services. Doc. 571-1 at 2–3 (Holmes Decl. ¶ 2). That is, defendant required plaintiffs to file the claims under the athletic trainer's NPI number. *Id.* Ms. Holmes also explained that defendant's policies and procedures required necessary and appropriate medical records to support each claim. *Id.* She explained how to complete the form properly, including where plaintiffs needed to place each NPI number on the form. *Id.*; Doc. 571-1 at 12–17 (Ex. 3-C); *see also* Doc. 609-1 at 12 (Bass Decl. ¶ 46).

16

On the call, Ms. Holmes represented that defendant, if plaintiff Vivature filled out the

HCFA 1500 form as instructed, would process and pay the claims.[7]  Doc. 609-1 at 12 (Bass

Decl. ¶ 45).  Ms. Holmes requested that plaintiff Vivature submit a batch of ten test claims via

fax so she could review them for compliance with her instructions.  *Id.* at 12–13 (Bass Decl.

¶ 47).  At the end of the call, plaintiff Vivature's employee, Brandon Stanwix, sought to confirm

Ms. Holmes's instructions.  *Id.*  Ms. Mzhickteno responded that defendant would deny the claims

because the claims were faxed, and defendant doesn't accept faxed claims.  *Id.*  Plaintiff

Vivature's attorney responded that plaintiff Vivature planned to fax the claims because defendant

had instructed it to fax the claims.  *Id.*  Ms. Mzhickteno responded, "That's your problem."  *Id.*

In response to Ms. Mzhickteno, plaintiff Vivature's attorney stated that, clearly, no matter what

plaintiff Vivature did, or how plaintiff Vivature filled out and submitted claims, defendant never

would pay the claims plaintiff Vivature submitted for its Kansas Clients.  Doc. 551 at 5 (King

---

[7]      The court notes two things about this fact because it's an important passage in the parties'
disputes.

    *First*, as discussed above, declarant Mr. Bass calls Ms. Holmes's statement a "fraudulent
misrepresentation."  Doc. 609-1 at 12 (Bass Decl. ¶ 45).  But it's not Mr. Bass's prerogative to decide that
this is a fraudulent misrepresentation.  That's a legal conclusion.  The court thus disregards this part of
Mr. Bass's declaration because it's not a statement of fact.  *See, e.g.*, *Gerson*, 20 F.4th at 1281 (rejecting
declaration that characterized something as "kidnapping" because the "kidnapping allegation [was] a legal
conclusion, and assertions of law do not bind the court"); *Skrzypczak*, 611 F.3d at 1244 (rejecting
"conclusory" affidavit that "state[d], in the affiant's opinion, the legal conclusion the court should
reach").

    *Second*, the parties' declarations on this topic conflict.  Mr. Bass's declaration provides:  "Holmes
specifically represented on this call that if Vivature filled out the HCFA 1500 in the manner being
requested that the Claims would be 'processed and paid.'"  Doc. 609-1 at 12 (Bass Decl. ¶ 46).  But
declarations from Ms. Holmes, Ms. King, and Ms. Mzhickteno assert that none of them promised
plaintiffs that defendant, if plaintiff Vivature submitted claims in the manner defendant requested, would
pay and process all claims submitted by plaintiff Vivature for its Kansas Clients.  Doc. 551 at 5 (King
Decl. ¶ 11); Doc. 551-1 at 6–7 (Mzhickteno Decl. ¶ 11); Doc. 571-1 at 4 (Holmes Decl. ¶ 5).  The court
resolves this factual dispute in the light most favorable to plaintiffs, the non-moving party, as the
governing legal standard requires.  The court thus assumes for summary judgment purposes that Ms.
Holmes told plaintiffs that if plaintiff Vivature filled out the HCFA 1500 form properly, defendant would
process and pay the claims.

Decl. ¶ 10); Doc. 551-1 at 6 (Mzhickteno Decl. ¶ 10); Doc. 571-1 at 4 (Holmes Decl. ¶ 4); Doc. 551-22 at 8–9 (Holmes Dep. 212:24–213:19); Doc. 609-1 at 12–13 (Bass Decl. ¶ 47). The next day, plaintiff Vivature submitted the test claims and asserted that it had made all of defendant's requested changes. Doc. 571-1 at 19 (Ex. 3-D).

The court pauses here briefly to mention what defendant *didn't* say during the October 17, 2017, call. Other than Ms. Mzhickteno's statement about denying faxed claims, none of defendant's representative said that defendant would deny plaintiff Vivature's claims. *Id.* at 12–13 (Bass Decl. ¶ 47). Defendant didn't say that it planned not to pay the claims, so submitting claims would prove futile. *Id.* And defendant didn't suggest that plaintiffs' claims were fraudulent. *Id.* Nor did defendant indicate that it questioned plaintiffs' billing or documentation. *Id.*

### *After the October Call*

The day after the call, Ms. Mzhickteno sent an email to her colleagues recounting the conversation. *See* Doc. 579-3 at 98 (Zimmerman Dep. Ex. 4). Ms. Mzhickteno's email made her feelings about plaintiffs quite clear:

> Until we get all past claims to their final adjudication, there is a possibility we make [sic] get a boxful of claims at the same time. We have no way to know for sure what they will be sending us. We mainly focused on what was required. It is my hope that eventually, with little to no reimbursement being made on these claims and with the reimbursement going to the member, there will be no value to continuing the partnership with the 3rd party biller and they will cease being an issue altogether. However, we do cover athletic trainer services so I may not get my wish!

*Id.*

After the call, plaintiffs spent several months investing time and resources trying to devise a process that would lead to defendant processing and paying the claims. Doc. 609-1 at 13 (Bass Decl. ¶ 48). But the parties continued to have issues, and—predictably—each side

blamed the other.  Defendant asserts that plaintiff Vivature failed to submit claims properly.

Doc. 551 at 4 (King Decl. ¶ 7).  Plaintiffs blame defendant.  For example, on November 14,

2017, plaintiff Vivature's attorney wrote Ms. Holmes via email, asserting, "This is starting to

look like a scheme to simply find excuses to deny and not pay these claims."  *Id.* at 54 (Ex. 1-Q).

And, to plaintiffs' great frustration, on December 4, 2017, defendant informed plaintiffs that

defendant didn't have certain providers enrolled in their system.  Doc. 609-1 at 181 (Ex. 1.28).

By January 2018, some claims had made their way into defendant's system.  *Id.* at 13

(Bass Decl. ¶ 49).  But plaintiffs noticed that defendant had "pended" the claims rather than

processing and paying them.  *Id.*  Because defendant didn't process the claims, the claims

remained "in limbo."  *Id.*  Plaintiffs asked defendant about this issue repeatedly; so often that

defendant, on February 6, 2018, sent plaintiff Vivature a cease and desist letter.  *Id.* at 145 (Ex.

1.15).

Fast forward from early 2018 to 2021 and 2022.  Plaintiff Vivature still was trying to

submit claims to defendant.  From November 2021 to August 2022, plaintiff Vivature submitted

claims to defendant via hardcopy and included a letter explaining that it did so based on

defendant's instructions.  *Id.* at 147 (Ex. 1.16); *Id.* at 150 (Ex. 1.17); *Id.* at 153 (Ex. 1.18); *Id.* at

156 (Ex. 1.19); *Id.* at 159 (Ex. 1.20); *Id.* at 162 (Ex. 1.21).  Plaintiff Vivature's letter also asked

defendant not to send any form letters asserting that the claims contained insufficient information

and, instead, to call Mr. Bass directly if defendant had concerns.  *Id.* at 147 (Ex. 1.16); *Id.* at 150

(Ex. 1.17); *Id.* at 162 (Ex. 1.21).

Despite plaintiff Vivature's request that defendant not respond with a form letter,

defendant did exactly that.  *Id.* at 148 (Ex. 1.16); *Id.* at 151 (Ex. 1.17); *Id.* at 163 (Ex. 1.21).

Plaintiff Vivature sent other letters, expressing its frustrations, and explaining that the form

letters' instructions contradicted defendant's other instructions to Vivature.  *Id.* at 159 (Ex. 1.20).

Beyond its form letters, defendant never explained why it had refused to process the claims.  *Id.*

at 14–15 (Bass Decl. ¶¶ 53–55).  This lack of communication prevented plaintiffs from

correcting any misunderstandings.  *Id.* at 14 (Bass Decl. ¶ 52).  And, without guidance from

defendant, plaintiffs changed their processes many times, trying to guess what defendant wanted.

*Id.* at 15 (Bass Decl. ¶ 55).

On February 14, 2018, plaintiff Vivature filed a complaint against defendant with the

Kansas Insurance Department.  Doc. 551-24 at 5–13 (Ex. 25-A).  Plaintiff Vivature's KID

complaint alleged defendant had engaged in "a systematic effort . . . to deny essentially all

medical claims being submitted by Vivature, on behalf of certain of its clients."  *Id.* at 5 (Ex. 25-

A).  And plaintiff Vivature told the KID that defendant had denied medical bills "in direct

contravention of state law and while acting in bad faith as an insurer[.]"  *Id.* at 6 (Ex. 25-A).

### *Status of Plaintiffs' Contracts with Kansas Clients*

Recall that plaintiffs had contracts with twelve Kansas Clients.  As already mentioned,

plaintiffs' Kansas Clients had no issues with plaintiffs until defendant's investigation.[8]  Doc.

---

[8]       Defendant cites deposition passages by the dozen trying to controvert this factual proposition, but
this effort falls short.  Doc. 600 at 16.  Defendant cites testimony from some schools explaining why they
no longer have a contract with plaintiff Vivature.  *See, e.g.*, *id.* (citing, indirectly, Doc. 551-7 at 13–14
(Washburn University Dep. 64:11–65:23) (explaining that Washburn University didn't select plaintiff
Vivature's bid because another company offered to take a smaller percentage of the claim)).  Defendant
also cites testimony from the schools, discussed at length in this fact section, that plaintiff Vivature never
notified the schools that they had breached their contracts with plaintiff Vivature.  *See, e.g.*, *id.* (citing,
indirectly, Doc. 551-7 at 15–16 (Washburn University Dep. 69:19–70:7)).  And defendant notes that the
schools had little to no knowledge of defendant's communications with third parties.  *See, e.g.*, *id.* (citing,
indirectly, Doc. 551-7 at 179–184 (Washburn University Dep. 233:15–238:6)).

None of this testimony effectively controverts any school's testimony that it had no issues with its
contract with plaintiff Vivature until defendant's investigation.  For example, even if defendant didn't
communicate directly with the school, defendant still sent letters to the school's athletic trainers that
alerted the school to defendant's investigation or, in the case of Washburn University, contacted
Washburn University directly.  Put differently, a school could have an active, current contract, but still
had hit a snag in its relationship with plaintiff Vivature.  So, for purposes of summary judgment, the court

579-8 at 38–39 (Washburn University Dep. 344:14–345:8); Doc. 579-11 at 6 (Allen County Community College Dep. 84:2–14); Doc. 579-13 at 8 (Baker University Dep. 116:3–16); Doc. 579-14 at 8–9 (Benedictine College Dep. 170:13–171:22); Doc. 579-15 at 20–21 (Emporia State Dep. 201:25–202:7); Doc. 579-16 at 23–24 (Fort Hays Dep. 89:9–90:5); Doc. 579-18 at 19–20 (Kansas Wesleyan University Dep. 94:8–95:10); Doc. 579-20 at 19 (McPherson College Dep. 135:11–22); Doc. 579-21 at 14–15, 21–22 (Newman University Dep. 122:12–123:10, 148:12–149:20); Doc. 579-22 at 13 (Pittsburg State Dep. 90:1–20); Doc. 579-24 at 12 (Southwestern College Dep. 149:4–17); Doc. 579-25 at 18–19 (Tabor College Dep. 137:13–138:10).[9]  The court recites the status of each contract, below.  Notably, of the twelve Kansas Clients, seven schools still have active contracts with plaintiff Vivature.

---

accepts plaintiffs' statement of fact that the schools had no issues with their contracts with plaintiff Vivature until defendant's investigation.

[9]     The court notes that defendant attempted to controvert this fact as well.  Defendant's effort relies on deposition testimony, but some of the deposition testimony that defendant cited is missing from the summary judgment record.  *Compare* Doc. 600 at 15 (citing Doc. 551-12 (Tabor College Dep. 35:8–39:22)), *with* Doc. 551-12 (missing Tabor College Dep. 35:8–39:22); *compare* Doc. 600 at 15 (citing Doc. 551-11 (Emporia State Dep. 93:25–97:15)), *with* Doc. 551-11 (missing Emporia State Dep. 93:25–97:15); *compare* Doc. 600 at 15 (citing Doc. 551-17 (Pittsburg State Dep. 34:16–46:13)), *with* Doc. 551-17 (missing pages 34 and 35).

*Active Contracts*

Currently, Allen County Community College, Tabor College, Emporia State, Southwestern College,[10] Benedictine College,[11] and McPherson College[12] have an active contract with plaintiff Vivature.  Doc. 551-11 at 10–11 (Emporia State Dep. 38:13–39:21); Doc. 551-12 at 8 (Tabor College Dep. 32:2–13); Doc. 551-15 at 10 (Allen County Community College Dep. 11:6–9); Doc. 551-18 at 10–11 (Southwestern College Dep. 40:15–41:9); Doc. 551-19 at 10 (Benedictine College Dep. 14:20–22).  Kansas Wesleyan University couldn't recall if it currently has an active contract with plaintiff Vivature.[13]  Doc. 551-16 at 24–25 (Kansas Wesleyan University Dep. 45:23–46:1).

---

[10]    Southwestern College contracted with plaintiffs for COVID testing.  Doc. 551-18 at 14–15 (Southwestern College Dep. 44:7–45:18).  Southwestern College no longer needed this service when it finished with COVID testing—a decision Southwestern College made on its own.  *Id.* at 15 (Southwestern College Dep. 45:11–22).

[11]    Plaintiffs assert that defendant's "scheme" harmed them because their Kansas Clients didn't bill for COVID-related services.  But Benedictine College testified that it declined to use plaintiffs for COVID-related services because it "handled everything in house with [its] in-house nursing staff."  Doc. 551-19 at 12–13 (Benedictine College Dep. 16:24–17:18).

[12]    Though plaintiffs assert that they sustained damages when Kansas Clients failed to bill for COVID-related services, McPherson College testified that it wasn't aware of any contracts between McPherson College and plaintiff Vivature for COVID-19 related services.  Doc. 551-13 at 10–11 (McPherson College Dep. 44:12–45:4); Doc. 551-14 at 15 (McPherson College Dep. 77:3–16).  McPherson College also testified that it had used plaintiffs to bill for daily COVID screenings and it stopped billing for them because the screenings "weren't required anymore."  Doc. 551-14 at 14 (McPherson College Dep. 76:2–16).  McPherson College didn't bill for COVID testing because a campus clinic handled all of its testing needs.  *Id.* at 25 (McPherson College Dep. 162:13–20).

[13]    Again, plaintiffs assert that they suffered damages because their Kansas Clients, thanks to defendant, didn't bill for COVID-related services.  Kansas Wesleyan University testified that it didn't have a contract with plaintiffs for COVID-19 services.  Doc. 551-16 at 9–10 (Kansas Wesleyan University Dep. 22:19–23:5).  Kansas Wesleyan University considered plaintiff Vivature's proposal for COVID-related services, but ultimately decided to manage COVID services internally—a decision that had nothing to do with defendant.  *Id.* at 10–11 (Kansas Wesleyan University Dep. 23:6–24:17).

Defendant's "interference" "caused"[14] a decline in documentation of claims from Allen County Community College, Tabor College, and Southwestern College.  Doc. 609-1 at 7, 8 (Bass Decl. ¶¶ 24, 25, 27).  Defendant's "interference" had "caused" the other schools to reduce their billing and eventually stop billing altogether:  Emporia State stopped billing in February 2019,[15] Benedictine College in December 2019, McPherson College in April 2022, and Kansas Wesleyan University in April 2022.  *Id.* at 6, 7, 8 (Bass Decl. ¶¶ 20, 22, 23, 26).

### *Terminated Contracts*

Plaintiffs voluntarily terminated their contracts with Newman University and Baker University.  In 2020, Newman University and plaintiff Vivature signed a "Termination of Agreement and Release" that ended their relationship.  *See* Doc. 551-5 at 98–103 (Bass Dep. Ex. 10).  Newman University already had stopped billing for athletic trainers in 2017.  Doc. 551-10 at 11–12 (Newman University Dep. 45:20–46:11).  Newman University also testified that

---

[14]     The court pauses here to explain its use of quotation marks around "interference" and "caused." Plaintiffs' statements of fact about these contracts—and the supporting declaration from Mr. Bass—contain several impermissible legal conclusions.  Specifically, plaintiffs assert that defendant interfered in these contracts, that all seven of these schools have breached their contracts, and that defendant's interference caused the schools to breach their contracts.  Doc. 579 at 26–28 (citing Doc. 609-1 at 6–8 (Bass Decl. ¶¶ 20–27)).  These are legal conclusions about tortious interference, causation, and breach of contract.  The court can't consider legal conclusions at summary judgment.  *Palmer v. Shawnee Mission Med. Ctr., Inc.*, 355 F. Supp. 3d 1003, 1009 (D. Kan. 2018) (declining to consider legal conclusions at summary judgment); *Sprint Commc'ns Co.*, 500 F. Supp. 2d at 1304 (explaining that legal conclusions are not "facts as would be admissible in evidence" as Fed. R. Civ. P. 56 requires (citations and internal quotation marks omitted)); *see also Shelter Mortg.*, 117 F. App'x at 10 (holding that the district court "correctly struck inadmissible hearsay and inadmissible legal conclusions" on summary judgment).  The court thus disregards the following improper legal conclusions asserted by plaintiffs:  that defendant interfered with the contract; that the schools breached their contracts; and that defendant's interference caused the schools to breach their contracts.  Plaintiffs repeat these improper, inadmissible legal conclusions for each of its Kansas Clients.  *See* Doc. 579 at 25–28.  That is, plaintiffs assert that defendant interfered with the Kansas Clients' contracts and caused the Kansas Clients to breach their contracts.  The court disregards all such legal conclusions about plaintiffs' Kansas Clients.

[15]     Though plaintiffs assert that they suffered damages when Kansas Clients failed to bill for COVID-related services, Emporia State testified that it had no contract with plaintiff Vivature to submit insurance claims for COVID-related services—a decision the school made.  Doc. 551-11 at 15–16 (Emporia State Dep. 43:20–44:19).

defendant's actions back in 2017 triggered Newman University to stop billing.  Doc. 607-8 at 17

(Newman University Dep. 135:9–16).  And Newman University's Director of Sports Medicine,

Cam Clark, testified, "Solely as a direct result of actions taken by Blue Cross Blue Shield of

Kansas, Newman University no longer uses the contracted billing services provided by Vivature

to bill for the rehabilitation therapy services performed by the athletic training team."[16]  *Id.* at 26

(Clark Decl. ¶ 4).

    Baker University also terminated its contract with plaintiff Vivature.  On June 30, 2017,

Baker University notified plaintiff Vivature that it wanted to end the relationship.  Doc. 609-1 at

126 (Ex. 1.8).  In August 2017, Baker University and plaintiff Vivature signed a "Mutual

Termination and Release" that ended their contract.  Doc. 551-5 at 152–58 (Bass Dep. Ex. 16).

Baker University's Director of Sports Medicine, Lynn Bott, testified, "Solely as a direct result of

---

[16]    The statement from Mr. Clark's declaration—blaming defendant for Newman University terminating its contract—contradicts testimony by Newman University's Rule 30(b)(6) witness.  Doc. 607-8 at 23 (Newman University Dep. 155:12–16); *see also* Doc. 502 (Newman University Dep. Notice).  Newman University's Rule 30(b)(6) witness testified that, in 2020, it decided not to renew its contract with plaintiff Vivature because at the time "it wasn't as advantageous financially for us to continue."  Doc. 551-10 at 14 (Newman University Dep. 48:3–7).  Newman University's Rule 30(b)(6) witness also testified that nothing said or done by defendant had anything to do with Newman University's decision not to renew its contract with plaintiffs.  *Id.* at 25 (Newman University Dep. 83:6–18).

    The court credits the Clark Declaration, which plaintiffs have proffered.  Our Circuit has concluded that "the testimony of a Rule 30(b)(6) witness is merely an evidentiary admission, rather than a judicial admission."  *Vehicle Mkt. Rsch. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1261 (10th Cir. 2016).  So, testimony "'given at a Rule 30(b)(6) deposition is evidence which, like any other deposition testimony, can be contradicted and used for impeachment purposes.'"  *Id.* at 1260 (quoting *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001)); *see also S. Wine & Spirits of Am., Inc. v. Div. of Alcohol & Tobacco Control*, 731 F.3d 799, 811 (8th Cir. 2013) ("A 30(b)(6) witness's legal conclusions are not binding on the party who designated him[.]" (citation omitted)), *overruled on other grounds*, *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019).  At summary judgment, however, the court can't weigh the credibility of Mr. Clark's testimony against testimony by Newman University's Rule 30(b)(6) witness.  So, the court resolves the factual dispute in the light most favorable to plaintiffs, as the non-moving party, and thus accepts Mr. Clark's Declaration, as the summary judgment version of events.

actions taken by Blue Cross Blue Shield of Kansas, Baker University no longer uses the billing

services provided by Vivature."[17]  Doc. 579-13 at 35 (Bott Decl. ¶ 4).

Recall that plaintiffs had 12 Kansas Clients.  The above discussion explains that seven

schools have active contracts and two schools have terminated their contracts.  That leaves three

schools.  The court discusses the status of these three schools' contracts, next.

### Expired Contracts

Plaintiff Vivature's contract with Washburn University expired by its terms.  Doc. 551-7

at 9–10, 11–12, 13–14 (Washburn University Dep. 40:13–41:4, 55:1–56:9, 64:11–65:2).  At

various times throughout 2022, Washburn University stopped or reduced its billing.  Doc. 609-1

at 6 (Bass Aff. ¶ 16).  As mentioned above, Washburn University testified that defendant's 2017

letters and calls led Washburn University to believe that plaintiff Vivature had created a new

business entity without Washburn University's permission.  Doc. 579-8 at 31–35 (Washburn

---

[17]     The Baker University evidence tracks the Newman University evidence.  That is, Mr. Bott's declaration—which blames defendant for Baker University terminating its contract with plaintiff Vivature—contradicts the testimony of Baker University's Rule 30(b)(6) representative.  Baker University's Rule 30(b)(6) representative testified that, when Baker University terminated its contract, it had concluded that its arrangement with plaintiff Vivature was void and not workable under Kansas law and applicable payer policies.  Doc. 551-9 at 7–8 (Baker University Dep. 78:24–79:9).  Baker University testified that it reached this conclusion on its own; defendant didn't cause it to reach that conclusion.  *Id.* at 8–9 (Baker University Dep. 79:10–80:5).  And Baker University testified that it decided to end its relationship with plaintiff Vivature on its own accord.  *Id.* at 12 (Baker University Dep. 83:8–22).  In sum, according to Baker University's Rule 30(b)(6) witness, nothing said or done by defendant resulted in Baker University's desire to end its relationship with plaintiff Vivature.  *Id.* at 12–13 (Baker University Dep. 83:18–84:3).

The court must credit Mr. Bott's declaration's version of events for the same reasons it resolved the Newman University fact dispute in plaintiffs' favor.  *See above* n.27.  And the Baker University factual dispute is simpler to resolve because, at Baker University's 30(b)(6) deposition, plaintiffs' counsel read Mr. Bott's declaration to Baker University's 30(b)(6) representative.  Doc. 579-13 at 15, 16–20 (Baker University Dep. 139:2–10, 140:21–144:24).  And, despite earlier contrary testimony, Baker University's Rule 30(b)(6) representative testified that the statements in Mr. Bott's declarations were true and accurate.  *Id.* at 20 (Baker University Dep. 144:18–24).  So, the court credits Mr. Bott's declaration and its version of events.

University Dep. 337:12–341:3); *Id.* at 54 (Ex. 7.2); *Id.* at 56–58 (Ex. 7.3).  Washburn University then notified plaintiff Vivature of the school's position that plaintiff Vivature had breached the contract.  *Id.* at 31–35 (Washburn University Dep. 337:12–341:3).

Plaintiffs also complain that defendant's actions caused Washburn University to decline to bill for COVID-related services.[18]  Washburn University authorized plaintiff Vivature to bill for COVID testing—specifically, to bill through the CARES Act.  Doc. 551-8 at 17–18 (Washburn University Dep. 38:2–39:13).  Washburn University testified it stopped billing for COVID testing because "we just had enough COVID tests, to be honest."  *Id.* at 12–13 (Washburn University Dep. 16:23–17:7).  Washburn University also testified that its decision not to bill for COVID testing had nothing to do with defendant.  *Id.* at 14–16 (Washburn University Dep. 18:17–20:9).

Fort Hays State testified that its contract with plaintiff Vivature expired by its own terms.[19]  Doc. 551-20 at 11 (Fort Hays State Dep. 15:2–12).  Plaintiffs contend that Fort Hays prematurely terminated its contract.  Doc. 609-1 at 6 (Bass Decl. ¶ 18).  Fort Hays State also testified that but for the "hassle" from defendant, Fort Hays State would've continued with its billing.  Doc. 579-16 at 33 (Fort Hays State Dep. 103:1–4).

---

[18]     Plaintiffs' expert, Scott M. Wood, testified about plaintiffs' economic loss sustained because the Kansas Clients didn't bill for COVID related services.  Doc. 607-14 at 52 (Ex. 26.5).  He uses Tabor College as an example and then concludes that it's "reasonable to conclude that each of the Kansas Schools . . . would have been able to bill for the Covid services[.]"  *Id.*  The court understands Mr. Wood's point that, as a baseline, the court should assume that each school would've billed for COVID services.  But where one of the Kansas Clients has provided testimony specifying the actual reason for its decision, then Mr. Wood's assumption—based solely on Tabor College's example—can't displace the actual reason.

[19]     Fort Hays never contracted with plaintiffs for COVID-19 related services, nor did plaintiffs ever propose such a contract.  Doc. 551-20 at 12–13 (Fort Hays Dep. 16:24–17:9).

Pittsburg State no longer has a contract with plaintiff Vivature.[20]  Doc. 551-17 at 11 (Pittsburg State Dep. 19:1–5).  Pittsburg State stopped billing on all insurance in November 2021.  Doc. 609-1 at 7 (Bass Decl. ¶ 21).  Pittsburg State testified that it no longer has a contract with plaintiff Vivature because it "wasn't financially beneficial for the university to continue." Doc. 551-17 at 11 (Pittsburg State Dep. 19:6–9).  Pittsburg State further explained that it no longer billed after the contract expired because "it just wasn't generating the revenue that we were expecting."  *Id.* at 14 (Pittsburg State Dep. 23:15–23).  To end its contract with plaintiff Vivature, Pittsburg State let its contract expire, then terminated the contract in writing.  *Id.* at 11– 12 (Pittsburg State Dep. 19:13–20:22).  Pittsburg State testified that, but for defendant's actions, it probably "would be billing today and making money today[.]"  Doc. 579-22 at 14 (Pittsburg State Dep. 91:2–7).

## IV.        Legal Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant."  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*,

---

[20]        Plaintiffs assert that defendant's "scheme" caused their Kansas Clients to fail to bill for COVID-related services, and Pittsburg State testified that it didn't have a contract with plaintiff Vivature for COVID-19 related services.  Doc. 551-17 at 13 (Pittsburg State Dep. 22:13–15).  According to Pittsburg State, plaintiff Vivature never even proposed such a contract.  *Id.* (Pittsburg State Dep. 22:16–18).

477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler*, 144 F.3d at 670).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).  Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144 F.3d at 671).  Affidavits and testimony "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not

sufficient." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022) (quotation cleaned up).

Finally, federal courts don't view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it represents an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## V.        Analysis

Defendant moves for summary judgment against all of plaintiffs' claims. The court analyzes the summary judgment arguments in this order. *First*, it begins with defendant's argument that plaintiffs lack prudential standing to bring this lawsuit. After concluding that plaintiffs indeed do have prudential standing, the court proceeds, *second*, to defendant's argument that plaintiffs can't recover their damages because their damages flow from "insurance policy benefits." *Last*, the court addresses plaintiffs' damages theories.

### A.        Prudential Standing

Defendant asserts that plaintiffs lack standing because plaintiffs' suit seeks to invoke the rights of someone else. Standing doctrine "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004) (citation and internal quotation marks omitted). Defendant here invokes the latter: prudential standing and, specifically, third party standing.

The Supreme Court's third party standing rule requires "that a party generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 129 (citation and internal quotation marks omitted). "Prudential standing imposes different demands than injury in fact." *Hill v. Warsewa*, 947 F.3d 1305, 1310 (10th Cir. 2020) (citation and internal quotation marks omitted). "Accordingly, a party may

suffer a cognizable injury but still not possess a right to relief." *Id.* (citation, internal quotation marks, and brackets omitted).  Notably, the court concluded in its Memorandum and Order on defendant's Motion to Dismiss, that plaintiffs had prudential standing.  *See* Doc. 293 at 12–13.  Nonetheless, defendant raises the argument again.

Defendant asserts that this case presents a prudential standing problem like the one in *G & S Holdings LLC v. Continental Cas. Co.*, 697 F.3d 534 (7th Cir. 2012).  There, a gas plant exploded, and the plant's owner filed a claim with its insurer.  *Id.* at 536–37.  The plant owner contended that the insurer had made inadequate payments on the claim and thus sued the insurer.  *Id.*  But then, the owner later filed for bankruptcy.  *Id.*  In a separate action, some parties whose businesses relied on the plant owner—the *G & S Holdings* plaintiffs—sued the insurer directly.  *Id.* at 537.  They claimed the insurer's failure to pay adequate damages to the plant owner had caused them to sustain damages.  *Id.*  Plaintiffs asserted that "the operation of [the plant owner] was an integral component for the successful operation of the plaintiff companies, such that the success of each was interdependent."  *Id.* at 540.  So, plaintiffs argued, they had prudential standing because "the losses to the plaintiff companies were not derivative of the loss sustained by [the plant owner], but rather were separate losses suffered by the plaintiff companies in their own right."  *Id.*  The district court disagreed and dismissed the relevant claims for lack of standing.  *Id.* at 539.

The Seventh Circuit affirmed, holding that the *G & S Holdings* plaintiffs' injuries were derivative—not direct ones.  Even if the companies were interrelated with the owner of the bankrupt plant, the "losses to plaintiffs occurred because of the impact to [the plant owner] of its own losses."  *Id.* at 541.  The Seventh Circuit noted that if the plant owner "was in a strong enough financial position to easily sustain the loss occasioned by the underpayment, the

plaintiffs would not have been impacted by [the insurer's] actions." *Id.* The Seventh Circuit thus concluded that plaintiffs' injuries stemmed from the injury to the plant owner and, as a result, plaintiffs based their suit on the rights of a third party. *Id.* at 541–42. For that reason, plaintiffs lacked prudential standing.

Plaintiffs here argue that *G & S Holdings* doesn't apply to them and the present case. They're right. This case from the Seventh Circuit doesn't present facts like the ones presented here. *G & S Holdings* involved downstream effects—that is, the effect of defendant's alleged misdeeds flowed downstream from the plant owner to plaintiffs. In contrast, here, plaintiffs assert that defendant's "scheme"—fraud, fraud by nondisclosure, tortious interference, and defamation—harmed plaintiffs directly. To be sure, plaintiffs' damages implicate the rights of their Kansas Clients somewhat. But, even if the Kansas Clients were "in a strong enough financial position to easily sustain the loss occasioned by" defendant not paying their claims— the health insurance claims of the Kansas Clients—defendant's actions still would have affected plaintiffs. *Id.* at 541. Plaintiffs didn't get paid unless their Kansas Clients got paid. And the Kansas Clients terminated contracts with plaintiffs, stopped billing, and reduced billing because—plaintiffs' claims assert—of defendant's alleged wrongdoing. Plaintiffs' claims also assert that defendant attacked plaintiffs and made representations to plaintiffs directly. Plaintiffs thus bring direct claims, not derivative ones. They thus have the requisite jurisprudential standing to prosecute the claims they assert here.

### B.    "Policy Benefits"

Defendant next asks for judgment as a matter of law because, under Texas law,[21] plaintiffs can't recover damages that "flow or stem from the denial of [a] claim for policy

---

[21]    The parties don't agree on much, but they agree that Texas law governs this case. Doc. 543 at 2 (Pretrial Order ¶ 1.d.). A federal court exercising diversity jurisdiction must apply the choice of law rules

benefits" unless they show that they're entitled contractually to recover those policy benefits. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 499–500 (Tex. 2018) (citation and internal quotation marks omitted).  Defendant's argument takes this Texas rule completely out of context, however.

Imagine an insured who sues its insurer.  Texas law provides the insured both common law and statutory causes of action.  So, the hypothetical insured brings common law claims for breach of contract and bad faith.  And the insured also brings statutory claims under the Texas Insurance Code—*i.e.*, wrongful denial, failure to settle the claim in good faith, failure to conduct a reasonable investigation, and so on.  *See, e.g.*, *Ortiz v. State Farm Lloyds*, 589 S.W.3d 127, 133 (Tex. 2019).  To prevail on the insured's *statutory* claims, Texas law requires the insured to show a right to benefits under the policy.  *Id.* at 134 ("[T]he 'general rule' is that 'an insured cannot recover policy benefits as actual damages for an insurer's *statutory* violation if the insured has no right to those benefits under the policy.'" (emphasis added) (quoting *Menchaca*, 545 S.W.3d at 495)).  That principle is the reason Texas law provides the rule defendant tries to invoke here.  When "an insured seeks to recover damages that are predicated on, flow from, or stem from policy benefits, the general rule applies and precludes recovery unless the policy entitles the insured to those benefits."  *Menchaca*, 545 S.W.3d at 500 (citation and internal quotation marks omitted).  Texas law also requires that an insured suing under a statute must

---

of the state where the court sits—here, leading to Kansas choice of law rules.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Under Kansas choice of law principles, in tort cases "the law of the state where the tort occurred—*lex loci delicti*—should apply."  *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985).  Under "the doctrine of *lex loci delicti*, the situs of the injury determines the governing law." *Id.*  Here, the alleged injury purportedly imposed by defendant's fraud, fraudulent misrepresentation, tortious interference, and defamation occurred in Texas because that's where plaintiff—a Texas corporation—would have sustained any loss.  *See Hardesty, Puckett & Co. v. Empire Commc'ns, Inc.*, No. 89-4006, 1989 WL 106716 (D. Kan. Aug. 29, 1989) (determining the situs of a corporation's economic injury was its principal place of business).  Texas law thus governs all of plaintiffs' claims.

suffer an independent injury:  "[R]egardless of whether an insured is entitled to benefits under the policy, he may recover damages for a statutory violation that causes an injury 'independent from the loss of the benefits.'"  *Ortiz*, 589 S.W.3d at 134 (quoting *Menchaca*, 545 S.W.3d at 499–500).

This rule doesn't play any role here, however.  The cases defendant cites to support its argument don't resemble the facts of this case.  In each case, the *insured* brought the lawsuit against the insurer.[22]  Here, plaintiffs aren't insured by defendant—they're not insureds. Defendant's argument simply omits the word "insured" from its discussion of this Texas law. *See* Doc. 550 at 27.  And, unlike every case defendant cites,[23] plaintiffs aren't insureds seeking damages under a contract of insurance.  Instead, plaintiffs measure their damages as unpaid insurance claims because of the economic structure of plaintiffs' business model.  For that reason, plaintiffs' claims "flow from" unpaid insurance claims—but not within the meaning of *Menchaca* or *Ortiz*.  *Menchaca* and *Ortiz* provide that an insured can't pile extra claims—like fraud or Texas Insurance Code violations—on top of a breach of contract claim without a right to do so under the contract because those extra claims "flow from" the contract.  That's simply not the case here.  Plaintiffs don't pile their claims on top of a breach of contract claim.  Instead, plaintiffs assert that defendant's "scheme"—fraud, fraud by nondisclosure, tortious interference,

---

[22]     *Ortiz*, 589 S.W.3d at 129–30 (recounting insured's common law and statutory claims under homeowners' insurance policy against insurer); *Menchaca*, 545 S.W.3d at 485 (recounting insured's common law and statutory claims against home insurance company); *Henry v. Allstate Vehicle & Prop. Ins. Co.*, No. 4:20-CV-310, 2021 WL 1132812, at *1 (S.D. Tex. Mar. 24, 2021) (recounting plaintiffs' common law and statutory claims against insurer); *Flores v. Allstate Tex. Lloyds*, No. 4:18-CV-769, 2019 WL 6039925, at *1 (S.D. Tex. Nov. 14, 2019) (recounting insured's common law and statutory claims against insurer); *Rodriguez v. Safeco Ins. Co. of Ind.*, No. SA-18-CV-00851, 2019 WL 650437, at *1 (W.D. Tex. Jan. 7, 2019) (granting unopposed summary judgment motion against insured plaintiff's Texas Insurance Code, breach of contract, breach of the duty of good faith and fair dealing, and fraud claims).

[23]     *See above* n.22.

and defamation—harmed plaintiffs directly.  The court thus rejects defendant's second standing argument.

### C.  Damages[24]

Plaintiffs here bring four claims:  tortious interference, fraud, fraud by nondisclosure, and defamation.  The court assumes, for summary judgment purposes, that plaintiffs could establish all elements of these claims other than damages.  But, as explained below, even after that generous benefit, plaintiffs can't survive summary judgment because their damages theories suffer decisive inadequacies.  Below, the court lists the damages that plaintiffs seek for each claim.

Their tortious interference claim seeks:

- "$13,000,000 relating to lost money resulting from the early termination of contracts resulting in no billing taking place and the slowdown of documentation services or putting billing on hold, which are both breaches of contract, by certain Kansas Schools and the related decline in ability to bill for those services."

- "$8,057,028[] relating to lost money from certain Kansas Clients not billing for Covid related services."

Doc. 543 at 59 (Pretrial Order ¶ 5.A.).

Plaintiffs assert that these two types of tortious interference damages—the $13 million and $8 million figures mentioned above—"could also qualify as Fraud damages."  *Id.*  Plaintiffs' fraud claims also seek to recover two additional categories of damages:

- "$19,038,382.53 relating to lost money resulting from Defendant['s] fraudulent statement made in the October 17, 2017 telephone call."

---

[24]     The court notes that defendant has filed another motion addressing plaintiffs' damages:  a "Motion to Exclude Plaintiffs' Undisclosed Damages" (Doc. 585).  At a status conference on October 17, 2023, the court explained to the parties that it viewed this motion as one that's separate from the summary judgment motion.  That is, the court views the Motion to Exclude Plaintiffs' Undisclosed Damages as a motion in limine of sorts.  The court will not consider that motion, plaintiffs' response (Doc. 595) or defendant's reply (Doc. 606) when deciding defendant's summary judgment motion.  This Memorandum and Order considers just the arguments asserted in the summary judgment papers.

- "$100,000 relating to expenses incurred by Plaintiffs in effectuating the multiple different instructions provided to them by Defendant regarding Defendant's request that plaintiffs alter their standard claim submission process."

*Id.*  Plaintiffs contend that these damages apply to both their fraud and fraud by nondisclosure claims.  *Id.*

For their defamation claims, plaintiffs seek the same damages as their tortious interference claims:

- "$13,000,000 relating to lost money resulting from the early termination of contracts resulting in no billing taking place and the slowdown of documentation services or putting billing on hold, which are both breaches of contract, by certain Kansas Clients and the related decline in ability to bill for those services."

- "$8,057,028[] relating to lost money from certain Kansas Schools not billing for Covid related services."

*Id.* at 59–60 (Pretrial Order ¶ 5.A.).

In sum, plaintiffs assert four damages theories:  (1) $100,000 in expenses on their fraud and fraud by nondisclosure claims, (2) approximately $19 million in "lost money" on their fraud and fraud by nondisclosure claims, (3) $13 million in "lost money" for terminated contracts and decreased billing on all four claims, and (4) approximately $8 million for lost COVID billing on all four claims.  Plaintiffs' summary judgment brief also proffers a general or reputational damages theory.

Defendant argues that it is entitled to summary judgment because plaintiffs failed to disclose some of these damages in the manner required by the Federal Rules of Civil Procedure, and, separately, plaintiffs' damages theories fail as a matter of law.  The court's analysis of the damages arguments unfolds in this fashion:  it begins with plaintiffs' damages claims that fail for procedural reasons—general or reputation damages and out of pocket damages.  The court then

examines plaintiffs' damages claims that fail for legal reasons:  the three "lost money" damages theories.

### 1.   Plaintiffs Failed to Preserve a General Damages Theory in the Pretrial Order

Defendant argues that it's entitled to summary judgment because plaintiffs' monetary damages fail as a matter of law.  Plaintiffs responded that they're entitled to recover general damages.  The term "general damages" doesn't appear anywhere in the Pretrial Order. Nonetheless, plaintiffs assert that they're entitled to general damages on their defamation claim. Plaintiffs argue defendant's communications were defamatory per se.  Doc. 579 at 79.  "When defamation is per se, the communication is actionable in and of itself without proof of actual damages."  *Innovative Block of S. Tex., Ltd v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 418 (Tex. 2020).  "A statement is defamatory per se when it falls within one of the categories that the common law considers so obviously harmful to reputation that the jury may presume the existence of general damages."  *Id.*  Plaintiffs argue that defendant's defamatory per se statements entitle them to recover general damages.  Doc. 579 at 79.  "General damages are awarded for noneconomic harm, such as the embarrassment, humiliation, or loss of respect caused by the defamatory publication."  *Innovative Block*, 603 S.W.3d at 418.  Defendant argues plaintiffs waived their claim for general damages—*i.e.* reputation damages.  Doc. 600 at 25.  It's right.

Plaintiffs' Fifth Supplemental Disclosures mentions a specific form of general damages: reputational damages.  *See* Doc. 551-24 at 49 (Ex. 25-B).  The Fifth Supplemental Disclosures doesn't disclose an amount of reputation damages, however.  *Id.*  Plaintiffs also mention reputational harm at various places in the Pretrial Order.  *See* Doc. 543 at 21 ("This injury included damage to the relationship between Plaintiffs and their Kansas Schools which in turn

has resulted in reputational harm as well as economic damages.").  The Pretrial Order doesn't

disclose an amount of reputational damages, either.  *See generally id.*  And the section of the

Pretrial Order dedicated to "Damages and Non-Monetary Relief Requested" doesn't include any

disclosure that plaintiffs, at trial, will seek to recover damages for reputational harm.  *Id.* at 59–

60.  Critically, the 302-page Pretrial Order doesn't mention "general damages" anywhere.  *See*

*generally id.*; Doc. 543-1 (Pretrial Order Ex. 1); Doc. 543-2 (Pretrial Order Ex. 2).

Despite this conspicuous omission, plaintiffs try to save their claims from summary

judgment by invoking general damages in their opposition brief.  Doc. 579 at 79.  Plaintiffs

argue that Texas law presumes general damages for defamation per se.[25]  *Id.*  But a "'plaintiff

cannot escape the binding effect of the pretrial order by raising new issues in a response to the

defendant's motion for summary judgment.'"  *Sunderman v. Westar Energy, Inc.*, 520 F. Supp.

2d 1269, 1278 (D. Kan. 2007) (quoting *Robleado v. Deffenbaugh Indus., Inc.*, 136 F. Supp. 2d

1179, 1188 n.7 (D. Kan. 2001)); *see also Hullman v. Bd. of Trs. of Pratt Cmty. Coll.*, 732 F.

Supp. 91, 92 (D. Kan. 1990) (same), *aff'd*, 950 F.2d 665 (10th Cir. 1991); *Bieber v. Assoc.*

*Collection Servs., Inc.*, 631 F. Supp. 1410, 1414 (D. Kan. 1986) (declining to consider issues

raised for the first time in motion for summary judgment because "each of these new issues

[was] outside the confines of the pretrial order, and there [was] no subsequent modification, the

plaintiffs are bound by their contentions in the pretrial order").  Plaintiffs never mentioned

---

[25]     Plaintiffs never disclosed an amount for these general damages.  In a belated, unsatisfactory
attempt, plaintiffs' opposition to summary judgment announces—for the first time ever—that "the
damages caused by BCBSKS' assigning the U602 fraud/abuse code to all of the Claims is the dollar
amount of claim billed."  Doc. 579 at 79 n.441.  Not only is this reference too little and far too late, this
damages theory violates the substance of Texas law.  Plaintiffs theorize that they were entitled to receive
a percentage of the insurance claims for benefits, not the entire amount of the claims.  And, as explained
below, Texas law only allows plaintiffs to recover lost *profits*.

general damages in the Pretrial Order and the "pretrial order is the controlling document for trial." *Id.* Plaintiffs thus failed to preserve a reputation damages or a general damages theory.

Plaintiffs never acknowledge this potential waiver issue. And it's not the court's job to construe scattershot references to "reputational harm" to help plaintiffs preserve a claim that's not specifically identified as an item of recoverable damages. The court recognizes that "pretrial orders generally should be construed liberally[.]" *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1220 (10th Cir. 2000). But the court "may more strictly construe such an order when the party favoring a liberal construction has had ample opportunity to refine the order and when the final order is properly drawn and substantially specific." *Id.* at 1220–21.

Plaintiffs here have had ample opportunity to refine the Pretrial Order. The court even allowed plaintiffs' late, 272-page additions to the Pretrial Order, thus providing plaintiffs "ample opportunity to refine the order." *Id.* And these Pretrial Order issues have arisen despite the court's explicit warning—way back in November 2021—that it would "expect preciseness in the pretrial order." Doc. 293 at 15. If plaintiffs meant to attempt to recover damages for reputational harm or general damages, they were duty bound to specify that request in the damages section of the Pretrial Order. *See Sadiq v. Spirit AeroSystems, Inc.*, No. 07-1276, 2010 WL 11628797, at *9 n.45 (D. Kan. Jan. 26, 2010) (concluding plaintiffs asserted demotion damages rather than reliance damages because damages section of pretrial order mentioned demotion damages only). "A damages theory omitted from the pretrial order is waived." *Genesis Health Clubs, Inc. v. LED Solar & Light Co.*, 639 F. App'x 550, 557 (10th Cir. 2016); *see also Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[T]heories of damages not included in the pretrial order are waived[.]"). As a consequence, plaintiffs waived any claim for reputation damages or general damages.

The court also concludes that, after five years of virtually unbounded litigation, defendant was entitled to a precise Pretrial Order that explicitly defined the damages it was required to defend at trial. *See Monfore v. Phillips*, 778 F.3d 849, 850–51 (10th Cir. 2015) (explaining the importance of final pretrial orders to modern civil litigation because they "focus the mind on the impending reality of trial"). The court warned plaintiffs way back in November 2021 that it shared defendant's concerns about plaintiffs' lack of precision. *See generally* Doc. 293. And the court shares defendant's expectation that, "after nearly five years of litigation," plaintiffs should identify and disclose specific "coherent and cognizable claims and recoverable damages caused thereby." Doc. 600 at 13. The court thus concludes that plaintiffs' lack of precision and omission of a general or reputational damages theory from the Pretrial Order—only to reassert that theory in their summary judgment opposition—caused defendant prejudice.

As a result, the court, in its discretion, considers plaintiffs' general or reputational damages theory waived. The court next considers plaintiffs' request for $100,000 in expenses on their fraud and fraud by nondisclosure claims.

### 2. Plaintiffs Failed to Disclose Their Fraud Damages of $100,000 in Expenses

For their fraud and fraud by nondisclosure claims, plaintiffs seek $100,000. Doc. 543 at 59 (Pretrial Order ¶ 5.A.). Plaintiffs assert that this amount represents the expenses they incurred modifying their claims submission process. *Id.* Defendant argues that plaintiffs failed to disclose these out of pocket damages, so the court should exclude them. Once again, defendant's right.

### a. Plaintiffs' Rule 26 Obligation

Rule 26(a)(1)(A) provides that "a party must, without awaiting a discovery request, provide to the other parties" certain categories of information about witnesses and documents

that a party may use to support its claims or defenses in a lawsuit, as well as information about the damages claimed by the disclosing party.  Fed. R. Civ. P. 26(a)(1)(A).  Specifically, for damages claims, Rule 26(a)(1) requires a claiming party to disclose:

> a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]

Fed. R. Civ. P. 26(a)(1)(A)(iii).  Generally speaking, Rule 26(a)(1) entitles a defendant "to a specific computation of a plaintiff's damages."  *Isom v. Midwest Div.—OPRMC, LLC*, No. 13-2602, 2014 WL 3541842, at *3 (D. Kan. July 17, 2014).  "Rule 26 requires more than a lump sum statement of the damages allegedly sustained."  *Shelton v. Sha Ent, LLC*, No. CIV-20-644, 2021 WL 1407968, at *2 (W.D. Okla. Apr. 14, 2021) (citation and internal quotation marks omitted).  "A party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures."  Fed. R. Civ. P. 26(a)(1)(E).  With this standard in mind, the court next examines whether plaintiffs have discharged their Rule 26(a)(1)(A)(iii) obligation.

### b.    Plaintiffs' Disclosures

Plaintiffs assert that they "timely disclosed and adequately specified their damages[.]" Doc. 579 at 72.  To support this assertion, plaintiffs cite their "detailed spreadsheets, expert disclosures and designations and the detailed Rule 26 supplements[.]"  *Id.*  According to plaintiffs, even " a cursory glance at those documents shows that these damages were disclosed." *Id.*  And there's no room for doubt.  Plaintiffs have disclosed a lot of documents—some 21,000 pages are included in plaintiffs' summary judgment exhibits.  But plaintiffs never direct the court to any specific part of the record disclosing this $100,000 claim to defendant.  So, the court

reviews the documents plaintiffs referenced:  the spreadsheets, expert report, and Rule 26 Disclosures.[26]  Spoiling the mystery, the court doesn't find $100,000 in out of pocket expenses anywhere.

Plaintiffs' Fifth Supplemental Rule 26 Disclosures, served May 18, 2023, provides that plaintiffs seek damages for the "costs Plaintiffs incurred in making changes to its internal claims submittal systems, including increased labor hours expended[.]"  Doc. 579-27 at 55 (Ex. 26.6).  There's no amount attached to these damages, however.  *See id.*  Without even an amount, this reference can't satisfy plaintiffs' duty to provide "a specific computation of a plaintiff's damages."  *Isom*, 2014 WL 3541842, at *3 (explaining Rule 26(a)(1) entitles a defendant to specific computation of damages).

Beyond these Supplemental Disclosures, the summary judgment record contains several damages spreadsheets provided by plaintiffs.  Plaintiffs are correct, these spreadsheets are detailed; they comprise thousands of pages.  The spreadsheets provide data about insurance

---

[26]      Plaintiffs addressed their out of pocket expenses in response to one of defendant's interrogatories.  Specifically, one of defendant's interrogatories inquired about the time, monetary resources, and expenses that plaintiffs attribute to modifying their claims submission process.  Doc. 551-24 at 84 (Ex. 25-D).  In their May 2020 response to this interrogatory, plaintiffs asserted that they were "in the process of attempting to calculate the total amount of time, monetary resources, and expenses."  *Id.*  Plaintiffs acknowledged that this calculation would "necessitate an analysis of the time spent by employees and the salary or expenses for those employees."  *Id.*  Plaintiffs estimated their out of pocket expenses "to be several hundred thousand dollars."  *Id.*  And plaintiffs asserted there "were also some expenses related to sending the paper copies of claims.  These are estimated to be around $1,300."  *Id.*

This response suggests that plaintiffs knew what they needed to do.  It acknowledges the pieces that plaintiffs needed to assemble to compute an out of pocket damages claim.  But plaintiffs' summary judgment papers never direct the court to any part of the summary judgment record or even, for that matter, the record for the case that contains those pieces.  And plaintiffs appear to have abandoned their claim for the $1,300 in damages from sending paper copies; that amount, and that theory, didn't make it into the Pretrial Order.  *See generally* Doc. 543; Doc. 543-1; Doc. 543-2.  Nor do plaintiffs ever claim that the $100,000 in expenses includes the $1,300 in paper copies.  That's part of the problem:  plaintiffs never provide a computation for their out of pocket expenses, as Rule 26(a)(1)(A)(iii) requires.

claims and the billing for those claims—but nothing about out of pocket expenses.  The court briefly reviews each relevant spreadsheet, in turn, below.

Exhibit 1.3 is a spreadsheet of claims that includes the totals for claims made by plaintiffs' Kansas Clients.  They organized them by school:

| Client/School | Total Claim Dollars |
|---|---|
| Allen Community College | $ 1,530,489.00 |
| Baker University | $ 49,412.00 |
| Benedictine College | $ 529,683.00 |
| Emporia State University | $ 886,973.00 |
| Fort Hays University | $ 85,581.00 |
| Kansas Wesleyan University | $ 1,607,309.00 |
| McPherson College | $ 1,021,395.00 |
| Newman University | $ 12,944.00 |
| Pittsburge State University | $ 1,107,039.00 |
| Southwestern College | $ 1,289,641.00 |
| Tabor College | $ 2,110,884.30 |
| Washburn University | $ 1,095,740.01 |
| Washburn Update | $ 449,288.00 |
| | $ 11,776,378.31 |

Doc. 579-1 at 126 (Ex. 1.3).  To say the obvious, Exhibit 1.3 doesn't provide any information about plaintiffs' out of pocket expenses.  *See generally id.* at 125–3270 (Ex. 1.3).

Exhibit 1.4 contains information similar to Exhibit 1.3:  it lists claims submitted (both in dollars and numbers) and claims paid, organized by school.  *Id.* at 3271–12317 (Ex. 1.4).  It includes totals and the underlying claims:

| SCHOOLS | TOTAL BCBS CHARGES | TOTAL CLAIMS | TOTAL PAYMENTS RECEIVED | TOTAL CLAIMS PAID | Contract Date | Billing Start |
|---|---|---|---|---|---|---|
| TOTAL | $ 18,652,516.97 | 79,414 | $ 350,284.05 | 3,590 | | |
| ALLEN COMMUNITY | $ 1,805,780.00 | 4,470 | $ 5,332.80 | 37 | 3/7/2017 | March-17 |
| BAKER | $ 147,768.00 | 766 | $ 1,990.05 | 50 | 7/22/2016 | August-16 |
| BENEDICTINE | $ 1,062,268.00 | 3,875 | $ 113,213.20 | 1009 | 7/10/2017 | July-17 |
| EMPORIA STATE | $ 1,455,833.00 | 6,391 | $ 21,634.60 | 256 | 4/15/2016 | May-16 |
| FORT HAYS STATE | $ 314,033.00 | 1,374 | $ 22,253.42 | 266 | 4/14/2015 | June-16 |
| KANSAS WESLEYEN | $ 2,762,877.00 | 14,124 | $ 23,325.80 | 219 | 5/20/2016 | July-16 |
| MCPHERSON | $ 1,338,213.00 | 8,958 | $ 214.24 | 4 | 10/6/2016 | July-17 |
| NEWMAN | $ 255,398.00 | 1,128 | $ 48,448.92 | 608 | 8/1/2011 | November-15 |
| PITTSBURG STATE | $ 1,208,777.00 | 5,539 | $ 2,329.15 | 29 | 5/18/2016 | September-16 |
| SOUTHWESTERN | $ 1,937,623.00 | 6,719 | $ 2,880.75 | 32 | 6/17/2011 | August-16 |
| TABOR | $ 2,431,147.10 | 14,347 | $ 730.01 | 13 | 2/8/2017 | February-17 |
| WASHBURN | $ 3,932,799.87 | 11,723 | $ 107,931.11 | 1067 | 2/26/2016 | April-16 |

*Id.* at 3272 (Ex. 1.4).  Again, however, this data doesn't include any information about plaintiffs' out of pocket expenses.

Exhibit 1.5 is specific to Tabor College, listing its COVID billings.  *See id.* at 12319 (Ex. 1.5).  Again, this chart doesn't say anything about plaintiffs' out of pocket expenses.  *See generally id.* at 12318–22 (Ex. 1.5).

Exhibit 1.6 updated Exhibits 1.3 and 1.4, providing numbers for the claims that plaintiffs billed for the Kansas Clients and the claims paid by defendant.  It provides a variety of information about those schools:

| SCHOOLS | TOTAL BCBS CHARGES | TOTAL CLAIMS | TOTAL PAYMENTS RECEIVED | TOTAL CLAIMS PAID | Total Unpaid | Total Unpaid Claims |
|---|---|---|---|---|---|---|
| **TOTAL** | $ 19,388,838.97 | 84,184 | $ 350,456.44 | 3,591 | $ 19,038,382.53 | 80,593 |
| ALLEN COMMUNITY | $ 1,912,710.00 | 4,639 | $ 5,332.80 | 37 | $ 1,907,377.20 | 4,602 |
| BAKER | $ 147,768.00 | 766 | $ 1,990.05 | 50 | $ 145,777.95 | 716 |
| BENEDICTINE | $ 1,062,268.00 | 5,770 | $ 113,213.20 | 1009 | $ 949,054.80 | 4,761 |
| EMPORIA STATE | $ 1,825,420.00 | 8,286 | $ 21,634.60 | 256 | $ 1,803,785.40 | 8,030 |
| FORT HAYS STATE | $ 314,033.00 | 1,374 | $ 22,253.42 | 266 | $ 291,779.58 | 1,108 |
| KANSAS WESLEYEN | $ 2,762,877.00 | 14,124 | $ 23,325.80 | 219 | $ 2,739,551.20 | 13,905 |
| MCPHERSON | $ 1,338,213.00 | 8,958 | $ 214.24 | 4 | $ 1,337,998.76 | 8,954 |
| NEWMAN | $ 255,398.00 | 1,128 | $ 48,448.92 | 608 | $ 206,949.08 | 520 |
| PITTSBURG STATE | $ 1,213,871.00 | 5,573 | $ 2,329.15 | 29 | $ 1,211,541.85 | 5,544 |
| SOUTHWESTERN | $ 2,051,992.00 | 7,054 | $ 3,053.14 | 33 | $ 2,048,938.86 | 7,021 |
| TABOR | $ 2,463,132.10 | 14,509 | $ 730.01 | 13 | $ 2,462,402.09 | 14,496 |
| WASHBURN | $ 4,041,156.87 | 12,003 | $ 107,931.11 | 1067 | $ 3,933,225.76 | 10,936 |

*Id.* at 12324 (Ex. 1.6).  Yet again, this exhibit provides no information about plaintiffs' out of pocket damages, much less a "computation" of them.  *See generally id.* at 12324–18663 (Ex. 1.6).

Exhibit 1.7 provides another summary of claims plaintiffs submitted versus claims that defendant paid, organized by college alongside a timeline.  *See id.* at 18665–91 (Ex. 1.7).  It's organized by each individual school comprising the Kansas Clients.  These graphs include line and bar graphs meant to show that the schools' billing decreased over time.  For example, here's

the plaintiffs' graph for one of the Kansas schools—Allen County Community College—who

was one of plaintiffs' Kansas Clients:



*Id.* at 18666 (Ex. 1.6).  These charts provide nothing about out of pocket expenses.

This inventory just leaves one more kind of damage disclosures—plaintiffs' expert

materials.  *See* Doc. 607-14 at 48–52 (Ex. 26.5).  Plaintiffs' expert, Scott Wood, dedicated a

section of his report to "The Harm Caused by BCBSKS to Vivature."  *Id.* at 51.  Mr. Wood

mentions that plaintiffs lost business from its Kansas Clients, and references lost revenue and

profit.  *Id.*  Mr. Wood also mentions defendant's refusal to process and pay the claims and asserts

it caused plaintiffs a financial loss.  *Id.*  And, Mr. Wood notes, some of plaintiffs' Kansas Clients

reduced their billing or stopped billing altogether, causing plaintiffs more financial harm.  *Id.* at

51–52.  Mr. Wood's report includes a section dedicated to the Kansas Clients not billing

defendant for COVID services.  *Id.* at 52.  This report never mentions, however, out of pocket

expenses.

In sum, contrary to their representations, plaintiffs never identify any part of the summary

judgment record or even the case's broader record showing that they disclosed $100,000 of

expenses, much less the computation required by Rule 26(a)(1)(A)(iii).  Defendant thus correctly

asserted that it received plaintiffs' $100,000 in expenses for the first time in the Pretrial Order.

Given plaintiffs' failure to comply with Rule 26, the court now turns to Rule 37.  This rule

informs the decision about the ramification of plaintiffs' failure to comply with Rule 26's

obligations.

### c.       Consequences of Plaintiffs' Failures to Disclose

Under Rule 37(a)(3)(A), if "a party fails to make a disclosure required by Rule 26(a), any

other party may move to compel disclosure and for appropriate sanctions."  Fed. R. Civ. P.

37(a)(3)(A).  Also, under Rule 37(c)(1), if "a party fails to provide information . . . as required by

Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a

motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Fed. R. Civ. P. 37(c)(1); *see also Vesom v. Atchison Hosp. Ass'n*, 279 F. App'x 624, 631 (10th

Cir. 2008) ("The exclusion of evidence presented out of time is 'automatic and mandatory'

unless the violation was either justified or harmless." (quoting *Finley v. Marathon Oil Co.*, 75

F.3d 1225, 1230 (7th Cir. 1996))).

A district court has discretion to decide whether a Rule 26 violation is justified or

harmless and, when doing so, should consider the following factors:  "'(1) the prejudice or

surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the

prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the

moving party's bad faith or willfulness.'"  *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953

(10th Cir. 2002) (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d

985, 993 (10th Cir. 1999)).  Under Rule 37(c)(1), plaintiffs bear the burden to show that their

failure to disclose was substantially justified or harmless.  *See Hirpa v. IHC Hosps., Inc.*, 50 F.

App'x 928, 932 (10th Cir. 2002); *see also Fish v. Kobach*, 309 F. Supp. 3d 1048, 1115 (D. Kan.

2018).

Plaintiffs here fail to shoulder their burden.  Plaintiffs' summary judgment response never recognizes that they failed to disclose their out of pocket expenses.  So they never assert that their failure was substantially justified or harmless.  The court also concludes that this late disclosure significantly prejudices defendant—five years into this case and after the Pretrial Order has issued.  Plaintiffs assert that their out of pocket damages represent the time and money they spent altering their claims' submission process to fit defendant's demands.  If that's so, then the information to calculate out of pocket damages always rested squarely within plaintiffs' control.  Given the late stage of the case, and plaintiffs' conduct throughout it, the court concludes that plaintiffs' failure to comply with their Rule 26(a)(1)(A)(iii) obligation is so careless that it amounts to bad faith or willfulness.  It thus applies the authority conferred by Rule 37(c)(1) and prohibits plaintiffs from using this damage information to oppose the current summary judgment motion.

The court now turns to defendant's arguments about plaintiffs' "lost money" damages.

### 3. Texas Law Doesn't Recognize Plaintiffs' "Lost Money" Damages Theory

Plaintiffs' three remaining damages theories all seek "lost money."  Specifically, plaintiffs seek:

- "$13,000,000 relating to lost money resulting from the early termination of contracts resulting in no billing taking place and the slowdown of documentation services or putting billing on hold, which are both breaches of contract, by certain Kansas Schools and the related decline in ability to bill for those services" for all four of plaintiffs' claims;

- "$8,057,028[] relating to lost money from certain Kansas Clients not billing for Covid related services" for all four of plaintiffs' claims; and

- "$19,038,382.53 relating to lost money resulting from Defendant['s] fraudulent statement made in the October 17, 2017 telephone call" for plaintiffs' fraud and fraud by nondisclosure claims.

46

Doc. 543 at 59 (Pretrial Order ¶ 5.A.).  Defendant asserts that "lost money" isn't a permissible measure of damages under Texas law.  Defendant's right.

"The proper measure of damages is a question of law[.]"  *Signature Indus. Servs., LLC v. Int'l Paper Co.*, 638 S.W.3d 179, 187 (Tex. 2022) (citation and internal quotation marks omitted).  Texas law allows plaintiffs to recover just lost *profits*—specifically, net profits.  *See Holt Atherton Indus, Inc. v. Heine*, 835 S.W.2d 80, 83 n.1 (Tex. 1992) ("[T]he correct measure of damages is lost net profit, not gross profits.").  And under Texas law, "[d]amages must always be proved with reasonable certainty[.]"  *Perthuis v. Baylor Miraca Genetics Lab'ys, LLC*, 645 S.W.3d 228, 243 (Tex. 2022) (internal quotation marks and citations omitted).

Plaintiffs' term "lost money" doesn't appear in any case that plaintiffs cite to support their damages.[27]  Nowhere in plaintiffs' summary judgment response (Doc. 578) or response brief (Doc. 579) do plaintiffs defend or explain their use of the term "lost money."  Indeed, in a less than deft slight of hand, plaintiffs' summary judgment papers sometimes switch the language they use to describe the damages they seek, calling the claim damages "lost profits" rather than "lost money."  *See* Doc. 579 at 71.

But the Pretrial Order frames plaintiffs' damages as "lost money"—not lost profits.  Doc. 543 at 59 (Pretrial Order ¶ 5.A.).  The court declines to construe the Pretrial Order's term "lost money" liberally as an equivalent of "lost profits."  The court doesn't liberally construe filings

---

[27]     *See generally Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 882–90 (Tex. Ct. App. 2006) (using the term "lost profits" to determine damages and never using the term "lost money"); *Tilton v. Marshall*, 925 S.W.2d 672, 680 (Tex. 1996) (explaining the "measure of damages in a fraud case is the actual amount of the plaintiff's loss" and never using the term "lost money"); *Tex. Com. Bank Reagan ex rel. Tex. Com. Bank Nat'l Ass'n v. Lebco Constructors, Inc.*, 865 S.W.2d 68, 75–76 (Tex. Ct. App. 1993) (explaining proper calculation of fraud damages in purchase or transfer of property case and never using the term "lost money"); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983) (using "losses on the sales of the eighteen houses and lost profits thereon" as measure of damages and never using the term "lost money").

made by lawyers.  And, as explained above, the court declines to construe this Pretrial Order liberally because plaintiffs have "had ample opportunity to refine the order" and the Pretrial Order "is properly drawn and substantially specific."  *Koch*, 203 F.3d at 1220–21.  This is especially true here, where plaintiffs use the term "lost profits" throughout the 302-page Pretrial Order—which shows they can use and have used the term—but not when articulating their damages.  *See generally* Doc. 543 (Pretrial Order); *see also id.* at 59 (Pretrial Order ¶ 5.A.). Texas law simply doesn't recognize "lost money" as a form of recoverable damages.  The court thus concludes that plaintiffs' "lost money" damages fail as a matter of law.

To the extent plaintiffs intended for "lost money" to mean "lost profits," they waived that damages theory.  "A damages theory omitted from the pretrial order is waived."  *Genesis Health Clubs*, 639 F. App'x at 557.  Five years into this litigation, the rules of procedure entitled defendant to know how plaintiffs will measure their damages at trial and the vague term "lost money" doesn't disclose what plaintiffs are seeking—revenue, gross profits, net profits, etc.  The court finds, in its discretion, that allowing plaintiffs to assert a waived theory of damages in the Pretrial Order would prejudice defendant.

The court thus concludes that plaintiffs' three "lost money" damages categories fail as a matter of law.  This conclusion means that plaintiffs have zero viable damages theories, and defendant is entitled to summary judgment.  *See below* § V.D (explaining why absence of viable damages theories entitles defendant to summary judgment).

While the court could stop its analysis here, the court continues to explain why—even if the court construed "lost money" to mean "lost profits" and plaintiffs hadn't waived that theory—plaintiffs' "lost money" damage claims still would fail as a matter of law.  The court

first addresses plaintiffs' request for approximately $19 million, then their request for

approximately $13 million and, last, their request for $8 million.

### 4. Plaintiffs Improperly Calculated $19 Million of "Lost Money" Using Gross Profits Instead of Net Profits

Plaintiffs' first category of fraud and fraud by nondisclosure damages seeks $19,038,382

in "lost money resulting from Defendant['s] fraudulent statement made in the October 17, 2017

telephone call."  Doc. 543 at 59 (Pretrial Order ¶ 5.A.).  Pretend for a moment that the Pretrial

Order had used the term "lost profits" instead of lost money to describe this $19 million claim.

According to plaintiffs, they calculate their lost profits this way:  multiplying the dollar amount

of unpaid claims by the percentage of the claim that they recover as a fee.  Doc. 579 at 71 n.392.

Unfortunately for plaintiffs, that equation calculates gross profits, not net profits.

Texas law is clear and it is explicit—"if a party aims to recover lost profits, it must show

its net profits, not gross profits."  *Motion Med. Techs., LLC v. Thermotek, Inc.*, 875 F.3d 765,

779 (5th Cir. 2017) (citing *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d

203, 209 (Tex. Ct. App. 2004)).  "Net profits are 'what remains in the conduct of a business after

deducting from its total receipts all of the expenses incurred in carrying on the business.'"  *Id.*

(quoting *Atlas*, 131 S.W.3d at 209).  Gross profits, in contrast, are "the 'total sales revenue less

the cost of the goods sold, no adjustment being made for additional expenses and taxes.'"  *Id.*

(brackets omitted) (quoting *Gross Profit*, *Black's Law Dictionary* (10th ed. 2014)).  "A legally

adequate calculation of 'lost profits' therefore accounts for all expenses in carrying out the

business[.]"  *Id.*; *see also id.* at 779 n.14 (collecting Texas cases).

Not only does Texas law prescribe a specific calculation, "Texas law requires 'a party

seeking to recover lost profits to prove the loss through competent evidence with reasonable

certainty.'"  *Id.* at 779 (brackets omitted) (quoting *Atlas*, 131 S.W.3d at 206–07).  Any

"'opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.'" *Id.* (quoting *Atlas*, 131 S.W.3d at 206–07). And failure "to comply carries harsh consequences in Texas: 'If no evidence is presented to prove lost profits with reasonable certainty, the trial court must render a take-nothing judgment as to lost-profit damages.'" *Id.* (quoting *Barton v. Resort Dev. Latin Am., Inc.*, 413 S.W.3d 232, 236 (Tex. Ct. App. 2013)). So, when a fraud plaintiff's lost profits damages claim fails to account for expenses and seeks instead gross profits, not net profits, then that expression of its damages fails as a matter of law. *See id.* at 779–80 (affirming district court's judgment as a matter of law against Texas common law fraud claim where plaintiff calculated its lost profits using gross profits instead of net profits because without evidence of plaintiff's expenses, "a jury . . . could not determine lost profits with reasonable certainty" as Texas law requires).

Plaintiffs have made a fatal error with their math. Here's how plaintiffs describe their lost profit damages theory: "The contractual percentages (or profits) Plaintiffs are entitled to are disclosed in every contract, all of which have been produced. Accordingly, this percentage is multiplied by the dollar amount of the unprocessed or paid claims. Those amounts have also been disclosed in Plaintiffs['] damage model spreadsheets[.]" Doc. 579 at 71 n.392. But that's *gross* profits—it doesn't account for plaintiffs' expenses. *See Motion Med.*, 875 F.3d at 779 (citing *Gross Profit*, *Black's Law Dictionary*, (10th ed. 2014) (defining gross profits as "[t]otal sales revenue less the cost of the goods sold, no adjustment being made for additional expenses and taxes")). Texas law won't permit plaintiffs to recover their entire share of unpaid claims— plaintiffs must show their *net* profits. *See id.* To calculate net profits, plaintiffs must provide evidence of expenses, taxes, and the like. Plaintiffs haven't cited any evidence of these costs in the 21,000+ page summary judgment record they've submitted.

Plaintiffs' damages theory of $19,038,382.53 thus fails because plaintiffs haven't proffered evidence from which a reasonable factfinder could determine plaintiffs' lost profits with reasonable certainty, as Texas law requires.[28]  *See Perthuis*, 645 S.W.3d at 243 ("Damages must always be proved with reasonable certainty[.]" (internal quotation marks and citations omitted)); *Garcia v. Doe*, No. 2:17-cv-990, 2018 WL 6441026, at *4 (D.N.M. Dec. 7, 2018) (granting summary judgment on issue of future medical expenses where plaintiff failed to carry her burden to show damages were reasonably certain as New Mexico law required).

So, even if the court construed this $19 million "lost money" damages claim as a properly preserved lost profits theory, the claim nonetheless would fail as a matter of Texas law.  The court next addresses plaintiffs' request for $13 million.

---

[28]     In *Motion Medical*, the Fifth Circuit explained that, without evidence of plaintiff's "business expenses, a jury viewing this record could not determine lost profits with reasonable certainty."  875 F.3d at 780.  The court noted that this omission was "not fatal if, for instance, there is evidence that the victim 'was already profitable at the time damages began' and 'could have performed profitable services using only its existing resources.'"  *Id.* (quoting *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 879 (Tex. 2010)).  But, in *Motion Medical*, plaintiff failed to advance that argument and the argument wasn't supported by the trial record.  *Id.*  So, the Fifth Circuit held that the "proper recourse, then was for the district court to enter judgment as a matter of law instead of remanding for a new trial."  *Id.* (collecting authorities).

Similarly, here, plaintiffs never argue—and the summary judgment record contains no evidence—that plaintiffs already were profitable at the time of defendant's alleged interference or that plaintiffs could've performed profitable services with only its existing resources.  The court thus must impose the harsh consequences prescribed by Texas law and enter judgment as a matter of law on plaintiffs' lost profit damages.  *See id.*  "If no evidence is presented to prove lost profits with reasonable certainty, the trial court must render a take-nothing judgment as to lost-profits damages."  *Barton v. Resort Dev. Latin Am., Inc.*, 413 S.W.3d 232, 236 (Tex. Ct. App. 2013); *see also Atlas*, 131 S.W.3d at 209 (concluding evidence of lost profits fell "short of the legal requirement that lost profits be proven by competent evidence with reasonable certainty" and plaintiff "failed to establish lost profits as a matter of law" therefore it was court's "duty to render judgment for [defendant] because that is the judgment the trial court should have rendered").

### 5. Plaintiffs' $13 Million for Early Termination and Decreased Billing Doesn't Represent Lost Net Profits

Plaintiffs face a similar problem with the $13 million they seek as damages for all four claims. According to plaintiffs, this calculation represents "lost money resulting from the early termination of contracts resulting in no billing taking place and the slowdown of documentation services or putting billing on hold, which are both breaches of contract, by certain Kansas Schools and the related decline in ability to bill for those services." Doc. 543 at 59 (Pretrial Order ¶ 5.A.). While the $19 million figure discussed above represents past damages, this $13 million is a projection. Or, putting it another way, plaintiffs calculated the $19 million from claims they'd *already* submitted and the $13 million from claims plaintiffs contend they *would have* submitted in the what if world where their Kansas Clients didn't terminate their contracts or decreased their billing.

Defendant argues that plaintiffs failed to disclose these $13 million of damages and their computation. Doc. 550 at 29. That's not entirely correct. Plaintiffs' Fifth Supplemental Disclosures explains how they reached the $13 million this way:

> For schools that terminated their contracts with Plaintiffs, the calculation is based on using Vivature spreadsheets . . . and the revenues received prior to termination and then extrapolating the revenues that would have been received had the contracts not been terminated. Plaintiffs are of the opinion that their contracts with these schools would have lasted for a term of at least seven (7) years. This is based on Plaintiffs' decades of experience with contracting with schools and the duration those contracts generally last. The dollar amount of these damages is estimated to be at least $3,000,000.
>
> Further, Plaintiffs are of the opinion that certain Kansas Clients did not continue to bill for certain services that could, and should, have been billed under the contracts. This opinion is supported by an analysis of the Vivature spreadsheets . . . and testimony from certain Kansas Clients. For the schools that did not terminate their contracts, or at least the billing portions of them, Plaintiffs are of the opinion that billing declined as a direct result of the bad acts committed by BCBSKS. This is supported by an analysis of revenues received, contained in the Vivature spreadsheets . . . prior to approximately early 2017 and then comparing those to the

revenue from billing after BCBSKS's subsequent bad acts.  The dollar amount of these damages is estimated to be at least $10,000,000.

Doc. 551-24 at 50–51 (Ex. 25-B).  Unfortunately for plaintiffs, this calculation doesn't produce a number that Texas law recognizes as recoverable damages.

Instead, the disclosed calculation uses revenues, not profits.  Texas law allows plaintiffs to recover lost profits.  *Motion Med.*, 875 F.3d at 779 (citing *Atlas*, 131 S.W.3d at 209).  Lost revenues and lost profits aren't the same.  *Insignia Hosp. Grp., Inc. v. Jalaram Guru, LLC*, No. 07-19-00057-CV, 2020 WL 2786676, at *2 (Tex. Ct. App. May 27, 2020) ("Neither party suggests that lost revenues and lost profits are one and the same.  This may be because they are not."); *Heat Shrink Innovations, LLC v. Med. Extrusion Techs.-Tex., Inc.*, No. 02-12-00512-CV, 2014 WL 5307191, at *6 (Tex. Ct. App. Oct. 16, 2014) (prohibiting party from introducing evidence of lost profits where party had failed to provide opponent with calculation of lost profits and had "only provided evidence of lost sales, which is not the same thing."); *Holt Atherton*, 835 S.W.2d at 84 ("[L]ost income is not the correct measure of damages."); *see also Revenue*, Black's Law Dictionary (11th ed. 2019) (defining revenue as "[i]ncome from any and all sources; gross income or gross receipts"); *Profit*, Black's Law Dictionary (11th ed. 2019) (defining profit as the "excess of revenues over expenditures in a business transaction").

Plaintiffs' expert—Mr. Wood—doesn't help matters.  Mr. Wood didn't proffer a calculation of his own.  Instead, he asserts that defendant's conduct "resulted in lost revenue and profit from billing[.]"  Doc. 607-14 at 51 (Ex. 26.5).  Mr. Wood's equivocation—"lost revenue and profit"—doesn't provide plaintiffs' damages theory with the certainty that Texas law mandates.[29]  Mr. Wood also asserts that plaintiffs' damage spreadsheets provide "a fair and

---

[29]     Mr. Bass's declaration—CEO of plaintiff Vivature—addresses the $13 million in damages, but it's even less helpful than Mr. Wood's report because Mr. Bass uses the term "lost money."  Doc. 609-1 at 21 (Bass Decl. ¶ 75).

reasonable basis supporting the damages claimed by Vivature in this case." *Id.* But plaintiffs never explain how their damages spreadsheets comply with the governing law's mandate requiring them to calculate net profits. Nor could they; the spreadsheets contain data about claims billed and claims paid. Plaintiffs state explicitly that their spreadsheets set forth loss of *revenue*. Doc. 579 at 33 ("[T]here is no question that Plaintiffs suffered damages as a direct result of these actions by BCBSKS; these damages include the loss of revenue from the Kansas Clients, as set forth in Plaintiffs' damage models."). In short, these spreadsheets provide no information about plaintiffs' expenses—a number required to calculate net profits. *Motion Med.*, 875 F.3d at 779 ("Net profits are 'what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business.'" (quoting *Atlas*, 131 S.W.3d at 209)).

Plaintiffs have failed to show a genuine issue of material fact about whether the $13 million in lost money damages are reasonably certain, as Texas law requires. *Id.* at 779. Defendant carries its initial summary judgment burden under Fed. R. Civ. P. 56(c). Plaintiffs' response fails to identify a "genuine issue for trial" that forestalls summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation and internal quotation marks omitted). In sum, plaintiffs have failed to carry their burden to adduce evidence of a legally proper measure of damages for the terminated contracts and decreased billing. Texas law treats this failure as a death knell for their $19 million "lost money" claim. *Motion Med.*, 875 F.3d at 779.

So, even if the court considered plaintiffs' $13 million in "lost money" to have preserved, instead, a claim for lost profits, this damages theory nonetheless fails as a matter of law. The court now turns to plaintiffs' final damages category: $8 million.

###### 6.  Plaintiffs' $8 Million in COVID-Related Damages Doesn't Represent Net Profit

Last, plaintiffs seek "$8,057,028.00 relating to lost money from certain Kansas Clients not billing for Covid related services."  Doc. 543 at 59 (Pretrial Order ¶ 5.A.).  Plaintiffs seek these damages on all four of their claims.  *Id.*  Again, let's pretend that plaintiffs properly preserved a "lost profits" theory.  The question is whether the $8 million figure properly represents lost profits.  It doesn't.

Here's how plaintiffs explain their math en route to this $8 million claim:

> Plaintiffs' damages, resulting from BCBSKS' fraud and tortious interference, include the economic loss resulting from the majority of the Kansas Clients not billing for Covid-related services.  Tabor College is a prime example of the revenues that Vivature would have received had BCBSKS not undertaken its course of action as to all billing conducted by Vivature.  It is reasonable to conclude that the majority of the Kansas Clients, who all participate in NCAA sports, would have been able to bill for the Covid services, such as testing, provided to the Kansas Client athletes.  Not being able to bill for Covid for the Kansas Schools resulted in several million dollars of damages, separate and apart from the damages relating to unprocessed and unpaid claims; further an additional 17% of lost revenue can be added, as BCBSKS should have been paying the Covid claims submitted to BCBSKS.  This separate damage claim totals $8,057,028.00.

Doc. 579 at 40.  Mr. Bass's Declaration repeats this assertion almost verbatim.  Doc. 609-1 at 23 (Bass Decl. ¶ 82).  And plaintiffs' expert report by Mr. Wood provides the same explanation.  Doc. 607-14 at 52 (Ex. 26.5).  The problem, of course, is that all of these explanations use the term "revenue"—not profit.  *See* Doc. 579 at 40 ("Tabor College is a prime example of the *revenues* that Vivature would have received[.]" (emphasis added)); Doc. 609-1 at 23 (Bass Decl. ¶ 82) (same); Doc. 607-14 at 52 (Ex. 26.5) (same).  Plaintiffs' spreadsheet showing the alleged COVID damages doesn't help, either.  This exhibit provides Tabor College's billed and paid COVID claims.  Doc. 579-1 at 12319–21 (Ex. 1.5).  Notably, plaintiffs never explain how they use the numbers in the spreadsheet and the 17% revenue to calculate $8,057,028.  And this spreadsheet doesn't contain any information about plaintiffs' expenses.

So, for the same reasons that plaintiffs' $19 million and $13 million claims for "lost money" fail—even if properly preserved and construed as lost profits—no rational factfinder could award plaintiffs these $8 million damages with reasonable certainty. *Motion Med.*, 875 F.3d at 780 ("Without evidence of [plaintiff's] business expenses, a jury viewing this record could not determine lost profits with reasonable certainty."). Texas law thus entitles defendant to summary judgment on this claim as well.

### D.    Damages Summary

The court's analysis addresses all five of plaintiffs' damage theories. The court concludes that plaintiffs waived a damages theory of reputational or general damages because they failed to assert this theory in the Pretrial Order. *See above* § V.C.1. Plaintiffs also failed to disclose their fraud damages of $100,000 in expenses, so the court excluded those damages under Rule 37. *See above* § V.C.2. And the court concludes that all three of plaintiffs' "lost money damages" claims fail as a matter of law because they seek "lost money" and that's just not a thing under Texas law. *See above* § V.C.3. And last, even if the court construed the "lost money" claims in the Pretrial Order as lost profits claims, plaintiffs haven't calculated their damages in the way required by Texas law. *See above* § V.C.4–6. At best, plaintiffs have calculated their gross revenue lost. But revenue and lost profit aren't the same thing. And Texas law requires plaintiffs to prove their damages with reasonable certainty. Thus, under Texas law, the court must enter judgment as a matter of law against plaintiffs' "lost money" damages. *Barton*, 413 S.W.3d at 236 ("If no evidence is presented to prove lost profits with reasonable certainty, the trial court must render a take-nothing judgment as to lost-profit damages."). Plaintiffs have no legally viable damages theory. This dooms all four of plaintiffs' claims.

Damages is an element of plaintiffs' tortious interference claim. Under Texas law, to "prove tortious interference with an existing contract, [plaintiffs] must show (1) [they] had a

valid contract, (2) the defendant[] willfully and intentionally interfered with the contract, (3) the interference proximately caused [plaintiffs'] injuries, and (4) [plaintiffs] incurred actual damage or loss." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 749 (5th Cir. 2019) (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002)).

Damages also is an element of plaintiffs' fraud claim. Under Texas law, a fraud claim has six elements:

> (1) a material representation was made; (2) the representation was false; (3) when the representation was made the speaker knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the representation with the intent that it should be acted upon by the party; (5) the party acted in reliance upon the representation; and (6) the party thereby suffered injury.

*Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex. 1990) (citations omitted). Plaintiffs' fraud by nondisclosure claim has the same elements as a fraud claim, with the addition of a duty to disclose. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) ("Fraud by non-disclosure is simply a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be misleading as a positive misrepresentation of the facts.").

Without any viable damages theories, plaintiffs are missing a requisite of their tortious interference, fraud, and fraud by nondisclosure claims. The court thus grants defendant summary judgment on these claims because plaintiffs' damages theories fail as a matter of Texas law. *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) ("To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."); *see also El Dorado Motors, Inc. v. Koch*, 168 S.W.3d 360, 367–68 (Tex. Ct. App. 2005) (affirming summary judgment where plaintiffs failed to show lost profits with reasonable certainty and thus failed to raise a fact issue on an essential element of their claims).

As the court already has alluded, the elements of a defamation claim vary. "Damages . . . are not always an essential element of defamation." *Brady v. Klentzman*, 515 S.W.3d 878, 886 (Tex. 2017) (citation omitted). "If the statement is defamatory *per se*, then nominal damages may be awarded without proof of actual injury because mental anguish and loss of reputation are presumed." *Id.* (citation omitted). But "if the plaintiff seeks actual damages for loss of reputation or mental anguish (general damages) or for economic loss (special damages), he must present evidence of the existence and amount of these damages." *Id.* (citation omitted). Nowhere do plaintiffs assert that they seek nominal damages. To the contrary, plaintiffs ask to recover millions in actual damages. For their actual damages, plaintiffs failed to preserve a general damages theory in the Pretrial Order. And all of plaintiffs' special damages theories for economic loss—"lost money"—fail as a matter of law. This thus leaves plaintiffs' defamation claim without damages. Because plaintiffs seek actual damages and have failed to create a triable issue of these damages, the court grants summary judgment against this claim.[30] Defendant thus is entitled to summary judgment against this claim as well.

## VI.        Conclusion

As explained above, the court grants defendant's Motion for Summary Judgment (Doc. 549). This decision has consequences for other motions pending in this case.

Defendant has filed a "Motion to Dismiss and for Sanctions" (Doc. 562) that asks the court to dismiss the case with prejudice because plaintiffs allegedly interfered with a Rule 45 subpoena. The court denies this motion as moot in light of the court's summary judgment ruling.

---

[30]        The court notes that plaintiffs also have asked for punitive damages. Doc. 543 at 60 (Pretrial Order ¶ 5.A.). But all of plaintiffs' compensatory damages theories fail. A "plaintiff must show himself entitled to compensatory relief before punitive damages are recoverable." *Travelers Indem. Co. of Ill. v. Fuller*, 892 S.W.2d 848, 852 (Tex. 1995). So, plaintiffs' punitive damages request can't save their claims.

Defendant also has filed a "Motion to Exclude Plaintiffs' Undisclosed Damages" (Doc. 585).  As the court explained to the parties on a call discussing this motion, the court views this motion as a motion in limine, separate from the summary judgment issues addressed here. Because the court's summary judgment ruling obviates the need for a trial, the court denies this motion as moot.

And last, defendant filed a Motion to Exclude Plaintiffs' Experts (Doc. 610).  This motion also is denied as moot in light of this Order's rulings.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 549) is granted.

**IT IS FURTHER ORDERED THAT** defendant's "Motion to Disregard Certain Portions of the Deposition Errata Sheet of Plaintiffs' Federal Rule of Civil Procedure 30(b)(6) Corporate Representative" (Doc. 559) is denied as moot.

**IT IS FURTHER ORDERED THAT** defendant's "Objection to Plaintiffs' Post Pretrial Conference Insert" (Doc. 561) is overruled as moot.

**IT IS FURTHER ORDERED THAT** defendant's Motion to Dismiss and for Sanctions (Doc. 562) is denied as moot.

**IT IS FURTHER ORDERED THAT** defendant's Motion to Exclude Plaintiffs' Undisclosed Damages (Doc. 585) is denied as moot.

**IT IS FURTHER ORDERED THAT** defendant's Motion to Exclude Plaintiffs' Experts Scott M. Wood and Mouzon Bass, III (Doc. 610) is denied as moot.

The court thus directs the Clerk of the Court to enter a final judgment comporting with the case-ending rulings memorialized in this Order.

**IT IS SO ORDERED.**

Dated this 25th day of January, 2024, at Kansas City, Kansas.

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
